STATE OF NORTH CAROLINA v. ANTONIO ORLANDO MILLER

No. 544A94

(Filed 8 November 1996)

## 1. Evidence and Witnesses §§ 1246, 1261 (NCI4th)— first-degree murder—juvenile defendant—warning of rights—presence of parent

There was no error in a capital first-degree murder prosecution which resulted in a life sentence where defendant was seventeen years old when arrested; the arresting officers could not find a juvenile rights form and instead used an adult *Miranda* form and inserted an additional clause at the end, "Do you wish to answer questions without your parents/parent present?"; defendant stated that he understood his rights after each of the

STATE v. MILLER

[344 N.C. 658 (1996)]

first eight questions, stated that he did not want a lawyer and was willing to answer questions; stated when asked that he wanted his mother present; no more questioning occurred until defendant's mother was present; defendant was readvised of his rights and gave the same responses in her presence; defendant signed the rights form; defendant appeared embarrassed and ill at ease during the questioning; he replied that "She might as well leave" when asked if he would like for his mother to step out of the room; defendant's mother sat on a bench outside an open doorway where defendant could see her if he leaned forward and she was told she could come back in at any time; and defendant then made a full statement.

**Am Jur 2d, Juvenile Courts and Delinquent and Dependent Children §§ 28, 41, 80.**

**Comment Note.—Necessity of informing suspect of rights under privilege against self-incrimination, prior to police interrogation. 10 ALR3d 1054.**

**Validity and efficacy of minor's waiver of right to counsel—modern cases. 25 ALR4th 1072.**

**Admissibility of pretrial confession in criminal case— Supreme Court cases. 16 L. Ed. 2d 1294.**

2. **Robbery § 85 (NCI4th)— attempt—approaching and shooting victim—overt acts beyond mere preparation**

There was sufficient evidence to support convictions for attempted armed robbery and first-degree murder under the felony-murder rule where there was sufficient evidence of intent to commit armed robbery and overt acts toward its commission. Although defendant argues that the evidence was insufficient to show that his actions advanced beyond a mere preparation to commit robbery and that even if they did, he abandoned his robbery attempt as a matter of law when he ran away voluntarily after shooting the victim in the head, defendant clearly intended to rob the victim and took substantial overt actions toward that end. The sneak approach to the victim with the pistol drawn and the first attempt to shoot were each more than enough to constitute an overt act toward armed robbery, not to mention the two fatal shots fired thereafter. It was only after seeing what he had done that defendant became scared and ran away.

**Am Jur 2d, Evidence § 558; Homicide §§ 72-75.**

**STATE v. MILLER**

[344 N.C. 658 (1996)]

What constitutes termination of felony for purpose of felony-murder rule. 58 ALR3d 851.

3. **Robbery § 85 (NCI4th)— attempt—cause of cessation—no culpability distinction after overt act**

The trial court did not err in a prosecution for first-degree murder and attempted armed robbery by instructing the jury on attempted armed robbery that defendant's use of the firearm would have resulted in the robbery had it not been stopped or thwarted by defendant becoming scared and running away. The law draws no culpability distinction between voluntary or involuntary modes or causes of cessation; however, once a defendant engages in an overt act the offense is complete.

Am Jur 2d, Criminal Law § 159.

What constitutes termination of felony for purpose of felony-murder rule. 58 ALR3d 851.

4. **Robbery § 85 (NCI4th)— running away after shooting victim—overt act—abandonment of attempted armed robbery—not possible**

Defendant's contention in a prosecution for first-degree murder and attempted armed robbery that he had abandoned his robbery attempt when he ran away after shooting the victim is untenable. The evidence clearly shows that defendant had committed an overt act in furtherance of the crime well before he left the scene; once defendant placed his hand on the pistol to withdraw it with the intent of shooting and robbing the victim, he could no longer abandon the crime of attempted armed robbery.

Am Jur 2d, Criminal Law § 159.

What constitutes termination of felony for purpose of felony-murder rule. 58 ALR3d 851.

5. **Criminal Law § 757 (NCI4th)— instructions—reasonable doubt—"fully satisfies or entirely convinces" omitted—no error**

There was no error in a prosecution for first-degree murder and attempted armed robbery where defendant had requested the pattern jury instruction regarding the legal concepts of burden of proof and reasonable doubt and the court gave a version which it had written. The instruction given by the court was substantially similar to that approved in *State v. Brackett*, 218 N.C. 369, and

clearly passes the test established in *Victor v. Nebraska*, 511 U.S. 1. The instruction in no way lowered the burden of proof to less than beyond a reasonable doubt and was thus a correct statement of law. Additionally, the trial court's instruction complied substantially with defendant's requested instruction in that both explained that reasonable doubt is based on reason and common sense, both expressed the precept that a reasonable doubt must arise from evidence established or lacking at trial, and both explained that a defendant can be found guilty only if the jurors are satisfied of defendant's guilt beyond a reasonable doubt.

**Am Jur 2d, Homicide § 246; Trial §§ 1168-1175.**

**Construction of statutes or rules making mandatory the use of pattern or uniform approved jury instructions. 49 ALR3d 128.**

6. **Criminal Law § 468 (NCI4th)— closing arguments—objections to defendant's argument sustained—defendant allowed to present his version of facts**

There was no error in a prosecution for first-degree murder and attempted armed robbery where defendant contended that sustaining two objections to his closing argument impinged on his right to present a defense and violated the law regarding closing argument. In light of the circumstances surrounding the argument and the discretion afforded the trial court in controlling closing argument, it is evident that defendant was able to fully present in argument his version of the facts.

**Am Jur 2d, Trial §§ 533, 538, 705, 709.**

**Measures taken by trial judge to keep argument in proper bounds. 62 ALR2d 249.**

7. **Evidence and Witnesses §§ 173, 876 (NCI4th)— first-degree murder—statements of victim—admissible**

The trial court did not err in a prosecution for first-degree murder and attempted armed robbery by admitting statements the victim made within hours of his death. Testimony that the victim did not want to turn his back either on a teenage boy in general or on defendant in particular was relevant to show that the two of them did not have a close, trusting personal relationship, notwithstanding the fact that they were neighbors. To the extent the testimony shows any ill will between them, it also supports

the theory that defendant had a motive to kill the victim, and the testimony also corroborates defendant's admission to his cousin that he was going to kill "this neighbor" if he did not get some money soon. Even if considered hearsay, the testimony was admissible under the state-of-mind exception.

**Am Jur 2d, Evidence §§ 661-663, 690, 696; Homicide § 280.**

**Comment Note.—Statements of declarant as sufficiently showing consciousness of impending death to justify admission of dying declaration. 53 ALR3d 785.**

**Comment Note.—Sufficiency of showing of consciousness of impending death, by circumstances other than statements of declarant, to justify admission of dying declaration. 53 ALR3d 1196.**

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Small, J., at the 21 March 1994 Criminal Session of Superior Court, Bertie County, upon a jury verdict finding defendant guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to an additional judgment imposed for attempted armed robbery was allowed 14 February 1995. Heard in the Supreme Court 10 April 1996.

*Michael F. Easley, Attorney General, by Ronald M. Marquette, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Constance H. Everhart, Assistant Appellate Defender, for defendant-appellant.*

LAKE, Justice.

The defendant was indicted on 27 April 1992 for the 8 April 1992 murder of Walter Lee Moore. On 17 August 1992, the grand jury returned a second bill of indictment charging defendant with the attempted armed robbery of Moore. The defendant was tried capitally, and the jury found him guilty of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. Defendant was also convicted of attempted armed robbery. Following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended a sentence of life imprisonment for the murder conviction. The trial court imposed this sentence and a consecutive

thirty-five-year sentence for the attempted robbery conviction. For the reasons discussed herein, we conclude that defendant received a fair trial, free from prejudicial error.

At trial the State presented evidence tending to show that on 8 April 1992, Walter Lee Moore was shot to death as he sat in his van, which was parked in the driveway of his home located near Powellsville, North Carolina. Defendant Antonio Orlando Miller was seventeen years old at the time of the murder. He lived next door to Moore with his mother, Myra Porter, and his brother, Daric Miller.

Moore worked as a mechanic and maintenance man in Smithfield, Virginia; drove a blue Dodge van; and provided transportation for several riders who also worked in Smithfield. Moore generally left his home around 3:30 a.m. in order to get everyone to work on time. He was known to carry large sums of money, to always pay in cash and occasionally to sleep in his van.

On the evening of 7 April 1992, Moore was at the Red Apple, a twenty-four-hour convenience store located near his home. Vanessa Peele, an acquaintance, stopped to get gas and talked with Moore. They had a discussion about Ms. Porter and her sons, and Moore told Peele that "Snoot" (defendant) had asked to borrow some money from him and that defendant had to go to court for something. That same evening, Moore's sister, Mary Vinson, arrived at the Red Apple between 8:00 and 9:00 p.m. As Moore came out to talk with her, Vinson noticed defendant standing outside alone, looking into the store. Vinson then noticed defendant behind her car with both hands in his pockets, "just prancing around like something was bothering him." She asked Moore why defendant was standing out there watching him. Moore replied, "I don't know, but let me turn my back from him because I don't know what might would happen. Cause a dude like that, you can never tell, you know." Moore also stated to Vinson that defendant's mother had asked Moore to loan her $300 or $400 for defendant to go to court, but that he had refused her request. Moore and Vinson left soon thereafter, and Vinson saw defendant walking down the road toward his house.

Around 1:00 a.m. on the morning of 8 April 1992, Moore returned to the Red Apple and after talking briefly with a friend, drove away in the direction of Moore's house. He did not pick up his riders later that morning. One of them walked to Moore's house to check on him about 4:00 a.m. He discovered Moore's body inside his van, observed blood running down the side of Moore's head, and walked to the Red

Apple to call for help. When investigating officers arrived, Moore's body was in his van, and two nine-millimeter shell casings were found on the ground on the driver's side of the van.

An autopsy performed by Dr. Lawrence Stanley Harris revealed that Moore sustained two gunshot wounds to the face. The first, and probably fatal, wound was over the left side of the face outside the eye. It contained multiple slivers of glass, but no gunshot residue, suggesting that the bullet passed through glass. This bullet struck a major artery in the neck and came to rest in the back of the right shoulder. Its track suggested that Moore's face was turned away from the muzzle when the shot was fired. The impact of this bullet would have caused immediate unconsciousness and would have resulted in death within five minutes. The second bullet struck the central part of the face beside the nose. This wound was surrounded by a halo of black and red dots characteristic of powder burns. The distance of the gun's muzzle from the skin when the second shot was fired was approximately ten to twelve inches.

Special Agent Dwight Ransome and Deputy Steve Johnson interviewed defendant's mother at her residence. They also interviewed defendant's brother and several acquaintances. Thereafter, they began looking for defendant and eventually traced him to a mobile home. When the officers arrived at the mobile home, they saw defendant run from the back of the home and head for some woods. He was caught by the arresting officers before he entered the trees. A nine-millimeter pistol was found in a ditch behind the mobile home.

Agent Eugene Bishop, an expert in firearms and toolmark identification, examined the nine-millimeter weapon recovered and analyzed the two fired cartridges from the shooting scene along with the two bullets recovered from the body of Moore. He concluded that the two bullets and the two fired cartridges all had been fired from the nine-millimeter pistol found in the ditch.

After defendant was arrested, he was taken to the sheriff's office and advised of his rights. Since defendant was only seventeen years old, the arresting officers looked for a juvenile rights form but could not find one. Instead, they used an adult *Miranda* form and inserted an additional clause at the end, "Do you wish to answer questions without your parents/parent present?" After each of the first eight questions, defendant stated that he understood his rights. He also stated that he did not want a lawyer and was willing to answer ques-

STATE v. MILLER

[344 N.C. 658 (1996)]

tions. When defendant was asked if he wanted to answer questions without his parent(s) present, he replied, "No, I want her here." No more questioning occurred until defendant's mother was present.

The sheriff located and brought defendant's mother to the station. In her presence, defendant was readvised of his rights, and he gave the same responses. Defendant was not asked again if he wished to answer questions without his parents present since his mother was there. Agent Ransome told defendant, "Your mother's here. You wanted her here so you could talk with us." Defendant responded, "Yes, that's what I wanted." After going back over the rights form, defendant signed it, certifying that he had been advised of his rights. His signature was witnessed by his mother and Deputy Johnson.

After the officers asked about his whereabouts the preceding few days, defendant indicated he had arrived home at 11:00 the night before. One of the officers then said that defendant was wrong, that they knew from talking with his mother and others that he had not arrived home until 2:00 a.m. and had left shortly after that. Defendant then appeared embarrassed and ill at ease. He was asked, "Are you comfortable talking in front of your mom or would you like for her to step out of the room?" When defendant replied, "She might as well leave," his mother stood, left the room and sat on a bench outside the open doorway where defendant could see her if he leaned forward. She was told she could come back in at any time.

Defendant then made a full statement, confessing to the killing of Moore. He explained how he got up about 2:00 a.m. on the morning of 8 April 1992, got dressed, and left home about 2:30 a.m. He started walking to the home of his cousin Trina Sessoms, which took him past Moore's home. Defendant stated he walked toward Moore's house and crept up on the van that was in the driveway. He heard a car coming and hid in the bushes. After the car left, defendant crept back up on the driver's side of the van and stooped to pass the driver's seat. He thought he saw Moore's hand move but could not tell whether Moore was asleep. Defendant stated he then took out the pistol, aimed it at Moore and pulled the trigger. However, the pistol did not fire because the safety was on. Defendant bent down and took off the safety. He then stood up, again pointed the gun at Moore, turned his head, and "the gun shot twice." Defendant stated he did not take any of Moore's money because he was scared. Defendant also confessed to having thrown the nine-millimeter pistol into the ditch while running from the mobile home. At this point, defendant's

mother returned to the room, and they talked about everything he had said. She then announced she was leaving and departed with defendant's apparent consent.

Defendant made a pretrial motion to suppress this statement. After a hearing and findings of fact, the trial court denied the motion, and defendant's confession was admitted at trial. The State's evidence further showed that two days before the killing, defendant told his cousin Kenyon Askew that if he did not get any money for court, he was going to kill his next-door neighbor, Moore. The State and defendant stipulated that, "The defendant was scheduled to appear in court on April 9, 1992, because he was $200 in arrears on a $395 obligation or court indebtedness."

The defendant presented no evidence.

[1] In his first assignment of error, defendant contends the trial court erred in denying defendant's motion to suppress his confession on the grounds that neither he nor his mother was advised expressly that defendant had the right to his mother's presence during questioning and that he did not waive his right to have her present. This assertion is not supported by the evidence.

In *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), the United States Supreme Court held that a suspect must be informed of his rights upon being arrested: that is, to remain silent, to an attorney and that any statement made may be used as evidence against him. In addition to the above-mentioned constitutional rights, our legislature has granted to juveniles the right to have a parent, guardian or custodian present during questioning. N.C.G.S. § 7A-595(a)(3) (1995). Words that convey the substance of prequestioning warnings are sufficient. *State v. Haskins*, 278 N.C. 52, 61, 178 S.E.2d 610, 615 (1971).

The State may not use evidence obtained as a result of custodial interrogation against the juvenile at trial unless and until it demonstrates that the warnings were made and that the juvenile knowingly, willingly and understandingly waived them. N.C.G.S. § 7A-595(d). The State bears the burden of proving that a defendant made a knowing and intelligent waiver. *State v. Simpson*, 314 N.C. 359, 367, 334 S.E.2d 53, 59 (1985). "Whether a waiver is knowingly and intelligently made depends on the specific facts and circumstances of each case, including the background, experience, and conduct of the accused." *Id.* The totality of the circumstances must be carefully scrutinized when

STATE v. MILLER

[344 N.C. 658 (1996)]

determining if a youthful defendant has legitimately waived his *Miranda* rights. *State v. Fincher*, 309 N.C. 1, 19, 305 S.E.2d 685, 697 (1983).

In this case, it is clear that the additional language which the officers added to the adult rights form adequately conveyed the substance of defendant's right to have his parent(s) present during questioning. It is clear that defendant understood his rights, evidenced by his asking for his mother to be present, not giving any statement until she arrived and then beginning to answer and continuing to answer questions in her presence. Defendant's mother left the room only when defendant got embarrassed and showed that he wanted her to leave. Defendant appears to have known what he was doing, why he wanted her to leave and where she was in case he wanted her back in the room. This constituted a knowing and intelligent waiver of his right to her imminent presence during custodial interrogation. Further, the trial court found, following the pretrial hearing, that in the ten- by twelve-foot interrogation room, defendant could hear one of the officers tell his mother in the hall that she could come back in whenever she wanted just as easily as she was able to hear him say that she might as well leave. The trial court then found that, under these circumstances, defendant's mother was in effect present if defendant wished to counsel or confer with her while he made his statement. The evidence supported these findings, and the findings sustain the conclusion that defendant's statement was not taken in violation of his additional juvenile *Miranda* rights.

[2] In his next assignment of error, defendant argues there was insufficient evidence of attempted armed robbery and that the convictions for that offense and for first-degree murder under the felony murder rule should be vacated. Defendant asserts the evidence was insufficient to show that his actions advanced beyond a mere preparation to commit robbery and that even if they did, he abandoned his robbery attempt as a matter of law when he ran away voluntarily after shooting Moore in the head. We disagree.

The elements of an attempt to commit any crime are: (1) the intent to commit the substantive offense, and (2) an overt act done for that purpose which goes beyond mere preparation, but (3) falls short of the completed offense. *State v. Collins*, 334 N.C. 54, 431 S.E.2d 188 (1993); *State v. Smith*, 300 N.C. 71, 265 S.E.2d 164 (1980). "An attempted robbery with a dangerous weapon occurs when a person, with the specific intent to unlawfully deprive another of personal

property by endangering or threatening his life with a dangerous weapon, does some overt act calculated to bring about this result." *State v. Allison*, 319 N.C. 92, 96, 352 S.E.2d 420, 423 (1987).

In *State v. Price*, 280 N.C. 154, 184 S.E.2d 866 (1971), this Court summarized the requirement of an overt act as follows:

> "In order to constitute an attempt, it is essential that the defendant, with the intent of committing the particular crime, should have done some overt act adapted to, approximating, and which in the ordinary and likely course of things would result in the commission thereof. Therefore, the act must reach far enough towards the accomplishment of the desired result to amount to the commencement of the consummation. It must not be merely preparatory. In other words, while it need not be the last proximate act to the consummation of the offense attempted to be perpetrated, it must approach sufficiently near to it to stand either as the first or some subsequent step in a direct movement towards the commission of the offense after the preparations are made."

280 N.C. at 158, 184 S.E.2d at 869 (quoting *State v. Parker*, 224 N.C. 524, 525-26, 31 S.E.2d 531, 531-32 (1944), *overruled on other grounds by State v. Hageman*, 307 N.C. 1, 296 S.E.2d 433 (1982)).

Defendant cites *State v. McDowell*, 329 N.C. 363, 407 S.E.2d 200 (1991), for the proposition that not all unlawful killings constitute robbery attempts. He then seeks to analogize this case to *McDowell*. However, missing from the facts in *McDowell* was any clear statement by the defendant that the purpose for firing his weapon at the victim was robbery. *Id.* at 389-90, 407 S.E.2d at 215. The evidence there raised no more than a suspicion that the defendant intended to commit robbery. *Id.* The *McDowell* opinion does not suggest that shooting a gun at someone is an insufficient overt act to support a charge of attempted robbery, just that there must be evidence of an intent to rob the victim.

Here, defendant clearly intended to rob Mr. Moore and took substantial overt actions toward that end. His intent is evidenced by, *inter alia*, his statement to his cousin and his own admission to the authorities. In furtherance of the intended robbery, defendant took out his nine-millimeter handgun, sneaked up on Moore, tried to fire, took the gun back down, removed the safety, and then fired two lethal shots into the head of the victim. It was only *after* seeing what he had done that defendant became scared and ran away. The sneak

**STATE v. MILLER**

[344 N.C. 658 (1996)]

approach to the victim with the pistol drawn and the first attempt to shoot were each more than enough to constitute an overt act toward armed robbery, not to mention the two fatal shots fired thereafter. See *infra* discussion of *State v. Powell*, 277 N.C. 672, 178 S.E.2d 417 (1971). Thus, there is sufficient evidence of intent to commit armed robbery and overt acts toward its commission, and so, by extension, to support the convictions for attempted armed robbery and first-degree murder under the felony murder rule.

[3] In a related assignment of error, defendant contends that the trial court erred in instructing the jury on attempted armed robbery by stating that defendant's use of the firearm "would have resulted in the robbery had it not been stopped or thwarted by the defendant becoming scared and running away." Citing a jury instruction approved by this Court in *State v. Spratt*, 265 N.C. 524, 144 S.E.2d 569 (1965), defendant argues that, in order for a failed criminal endeavor to amount to an attempt, the stopping must have been the result of an *outside force* acting upon the defendant. Defendant contends that as a matter of law, there is a distinction between criminal attempts abandoned by the defendant himself and those in which an intervening force ends the robbery attempt. Thus, defendant argues the trial court's instruction improperly lowered the State's burden of proof by misstating or failing to state the significance of the fact that defendant voluntarily abandoned his intent to rob Mr. Moore. This contention is without merit in that the law does not support such a distinction.

In North Carolina, an intent does not become an attempt so long as the defendant stops his criminal plan, or has it stopped, prior to the commission of the requisite overt act. Defendant's contention that an outside force must stop the criminal plan is simply unfounded in the law. The law draws no culpability distinction between voluntary or involuntary modes or causes of cessation. A defendant can stop his criminal plan short of an overt act on his own initiative or because of some outside intervention. However, once a defendant engages in an overt act, the offense is complete, and it is too late for the defendant to change his mind. *State v. Davis*, 340 N.C. 1, 12-13, 455 S.E.2d 627, 632-33, *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 83 (1995). This Court held in *State v. Powell* that the evidence was sufficient to support a conviction for attempted armed robbery where the defendant placed his hand on a pistol and began to withdraw it from a purse with the intent of completing the substantive offense of armed robbery through its use. *Powell*, 277 N.C. at 677-79, 178 S.E.2d at 420-21.

STATE v. MILLER

[344 N.C. 658 (1996)]

**[4]** Defendant's contention that he abandoned his robbery attempt is likewise untenable. An abandonment occurs when an individual voluntarily forsakes his or her criminal plan prior to committing an overt act in furtherance of that plan. There is ample evidence in this case that defendant did not legally abandon his plan to commit armed robbery. The evidence clearly shows he had already committed an overt act in furtherance of the crime well before he left the scene. Once defendant placed his hand on the pistol to withdraw it with the intent of shooting and robbing Mr. Moore, he could no longer abandon the crime of attempted armed robbery. *See id.* The fact that he did not take the money is irrelevant. We therefore find no error in the trial court's instruction, and this assignment of error is overruled.

**[5]** Next, defendant asserts that he is entitled to a new trial because of error in the reasonable doubt instruction given at his trial. He argues that his request for an instruction stating that "proof beyond a reasonable doubt is proof that fully satisfies or entirely convinces you of the defendant's guilt" is a correct statement of the law that was not given in substance. We find, however, that the instruction given by the trial court on reasonable doubt substantially complied with defendant's request. .

During the charge conference conducted at the conclusion of the evidence and before closing arguments, counsel for defendant asked the trial court to instruct the jury, pursuant to N.C.P.I.—Crim. 101.10, regarding the legal concepts of burden of proof and reasonable doubt. The pattern instruction requested by defendant reads in pertinent part:

> A reasonable doubt is a doubt based on reason and common sense, arising out of some or all of the evidence that has been presented, or lack or insufficiency of the evidence, as the case may be. Proof beyond a reasonable doubt is proof that fully satisfies or entirely convinces you of the defendant's guilt.

Upon defendant's request for this instruction, the trial court informed counsel that it had rewritten the reasonable doubt instruction and showed counsel a copy of the instruction it intended to give. After reviewing the document, defense counsel expressed dissatisfaction with the trial court's intended instruction, requesting specifically that the trial court include within its charge that "proof beyond a reasonable doubt is proof that fully satisfies or entirely convinces you of the defendant's guilt." The trial court denied the request for this specific language, and defendant took exception.

STATE v. MILLER

[344 N.C. 658 (1996)]

In his charge to the jury, the trial judge instructed on reasonable doubt as follows:

> Under our system of justice when a defendant pleads not guilty, he is not required to prove his innocence. The defendant is presumed to be innocent. This presumption goes with him throughout the trial and until the jury is satisfied of his guilt beyond a reasonable doubt.
>
> This does not mean satisfied beyond all doubt. Neither does it mean satisfied beyond some shadow of a doubt or a vain, imaginary, or fanciful doubt. Rather, it means exactly what it implies. A reasonable doubt is a doubt based upon common sense and reason. It is a doubt generated by the insufficiency of the proof or the lack of proof or some defect in it.

At the conclusion of the jury charge, defendant renewed his request for his version of the instruction. Again the request was denied. Absent a specific request, the trial court is not required to define reasonable doubt, but if the trial court undertakes to do so, the definition must be substantially correct. *State v. Wells*, 290 N.C. 485, 226 S.E.2d 325 (1976); *State v. Shaw*, 284 N.C. 366, 200 S.E.2d 585 (1973). Where there is a specific request for a reasonable doubt instruction, the law does not require the trial court to use the exact language of the requested instruction. However, if the request is a correct statement of the law and is supported by the evidence, the trial court must give the instruction in substance. *State v. Moore*, 335 N.C. 567, 440 S.E.2d 797, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 174 (1994); *State v. Patterson*, 335 N.C. 437, 439 S.E.2d 578 (1994).

In this case, the reasonable doubt instruction given by the trial court was substantially similar to that approved in *State v. Brackett*, 218 N.C. 369, 372, 11 S.E.2d 146, 148 (1940).[1] The instruction also clearly passes the United States Supreme Court's test established in *Victor v. Nebraska*, 511 U.S. 1, 127 L. Ed. 2d 583 (1994) (reasonable doubt can be defined in many different ways; each is proper so long as it does not indicate that the burden of proof is less than "beyond a

---

1. The instruction in *Brackett* stated:

   The defendant is presumed to be innocent, and this presumption goes with him throughout the entire trial and until the jury is satisfied beyond reasonable doubt of his guilt; not satisfied beyond any doubt, or all doubt, or a vain or fanciful doubt, but rather what that term implies, a reasonable doubt, one based upon common sense and reason, generated by insufficiency of proof.

reasonable doubt"). Here, the trial court's instruction merely expanded on the concept of reasonable doubt by explaining what kinds of doubt would or would not constitute reasonable doubt. The instruction in no way lowered the burden of proof to less than beyond a reasonable doubt. Thus, the definition was a correct statement of the law. *See State v. Wells*, 290 N.C. 485, 226 S.E.2d 325.

In addition, the trial court's instruction on reasonable doubt complied substantially with the defendant's requested instruction. Both the requested instruction and the given instruction explained that reasonable doubt is based on reason and common sense. Both instructions also expressed the precept that a reasonable doubt must arise from evidence established or lacking at trial. Moreover, both instructions explained that a defendant can be found guilty only if the jurors are satisfied of the defendant's guilt beyond a reasonable doubt. Thus, the trial court's instruction conveyed the substance of defendant's requested instruction. We find no error in the denial of defendant's requested instruction. This assignment of error is overruled.

**[6]** Defendant next contends that he is entitled to a new trial because the trial court sustained two objections to his trial counsel's closing argument, thereby impinging on his right to present a defense and violating the law regarding closing argument. We disagree.

The prosecution's first objection followed this argument by defense counsel:

He's going to tell you about interested witnesses and I would say that the law enforcement officers are interested in this crime being—

MR. BEARD: Objection.

THE COURT: Sustained.

MR. LEWIS: Well, whether or not a person has any interest in this particular case, whether it's—for whatever reason they may think it's—they have an interest in it.

The second objection followed this argument:

[T]he State's whole case is built upon that motive that a person would take another person's life because they had to go to court and pay a $200 debt when they had $400 available already.

MR. BEARD: Objection to $400 available for the defendant, Your Honor.

STATE v. MILLER

[344 N.C. 658 (1996)]

THE COURT: Objection sustained. That contention is not warranted by the evidence that it was available.

The right of a defendant charged with a criminal offense to present to the jury his version of the facts is a fundamental element of due process of law, guaranteed by the Sixth and Fourteenth Amendments to the federal Constitution and by Article I, Sections 19 and 23 of the North Carolina Constitution. *See Faretta v. California,* 422 U.S. 806, 818, 45 L. Ed. 2d 562, 572 (1975); *Washington v. Texas,* 388 U.S. 14, 18-19, 18 L. Ed. 2d 1019, 1023 (1967); *State v. Locklear,* 309 N.C. 428, 436, 306 S.E.2d 774, 778 (1983). Improper restrictions on the defendant's opportunity to make a closing argument may constitute a denial of the constitutional right to counsel as well as the right to present a defense. *See Herring v. New York,* 422 U.S. 853, 45 L. Ed. 2d 593 (1975). Arguments of counsel are left largely to the control and discretion of the trial court. *State v. Daniels,* 337 N.C. 243, 446 S.E.2d 298 (1994), *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 895 (1995); *State v. Sanderson,* 336 N.C. 1, 442 S.E.2d 33 (1994); *State v. Erlewine,* 328 N.C. 626, 403 S.E.2d 280 (1991).

In this case, defendant was able to present the jury with his version of the facts and inferences to be drawn, notwithstanding the sustaining of these objections to defense counsel's argument. With regard to the testimony about law enforcement interest, defendant presented no evidence regarding interest of the police. The trial court's instructions permitted the jury to evaluate the testimony of all prosecution witnesses for interest, including that of the law enforcement officers. Furthermore, immediately after the trial court sustained the objection, defense counsel argued that the police did have an interest in the case. The jury was free therefore to evaluate whether the law enforcement officers' testimony should be believed in light of any interest they might have had in the outcome of the trial. The only thing excluded by the trial court was defense counsel's improper expressions of personal opinion that the law enforcement officers were interested witnesses.

With regard to the argument relating to the $400, defense counsel still argued their salient point to the jury—that the stipulated facts were inconsistent with a motive to rob. Immediately after the objection was sustained, defense counsel argued:

The stipulation is that Roosevelt Askew had posted a $400 bond. And I think the court will instruct you that you are the sole

STATE v. MILLER

[344 N.C. 658 (1996)]

judges. You decide what the weight is to be given to that stipula-
tion. If you look at the entire case and you base it on that moti-
vation and you square that motivation off with that stipulation,
you have no motivation.

Therefore, in light of the circumstances surrounding the argument
and the discretion afforded the trial court in controlling closing argu-
ment, it is evident that defendant was able to fully present in argu-
ment his version of the facts. Thus, we find no merit to defendant's
assignment of error.

**[7]** Lastly, defendant argues the trial court erred in admitting state-
ments the victim made within hours of his death to his sister, Mary
Vinson, and a friend, Vanessa Peele, on the grounds that the state-
ments are inadmissible hearsay and that their probative value is out-
weighed by their prejudicial impact.

As to the testimony of Vinson, a *voir dire* of the disputed evi-
dence was conducted at which Vinson testified that she saw and
spoke with Moore at the Red Apple on the evening of 7 April 1992.
Vinson noticed defendant standing beside the icebox and then, a few
minutes later, behind her car. Vinson asked Moore why defendant was
standing there watching him. Moore responded, "I don't know, but let
me turn my back from him because I don't know what might would
happen. Cause a dude like that, you can never tell, you know." Moore
also stated that defendant's mother had asked Moore to loan her $300
or $400 for defendant to go to court, but that he had refused her
request.

" 'Hearsay' is a statement, other than one made by the declarant
while testifying at the trial or hearing, offered in evidence to prove
the truth of the matter asserted." N.C.G.S. 8C-1, Rule 801(c) (1988).
"[W]henever an extrajudicial statement is offered for a purpose other
than proving the truth of the matter asserted, it is not hearsay." *State
v. Maynard*, 311 N.C. 1, 15-16, 316 S.E.2d 197, 205, *cert. denied*, 469
U.S. 963, 83 L. Ed. 2d 299 (1984).

The testimony in question was probative of something other than
the truth of the matter asserted. The testimony that Moore did not
want to turn his back either on a teenage boy in general or on defend-
ant in particular was relevant to show that the two of them did not
have a close, trusting personal relationship, notwithstanding the fact
that they were neighbors. To the extent the testimony shows any ill

**STATE v. MILLER**

[344 N.C. 658 (1996)]

will between them, it also supports the theory that defendant had a motive to kill Moore. *See State v. Greene*, 324 N.C. 1, 15-16, 376 S.E.2d 430, 439 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990). The testimony also corroborates defendant's admission to his cousin that he was going to kill "his neighbor" if he did not get some money soon. It was therefore admissible on this basis.

Further, even if considered hearsay, this testimony was admissible under the state of mind exception to the hearsay rule. N.C.G.S. § 8C-1, Rule 803(3) (1988). "Evidence tending to show a presently existing state of mind is admissible if the state of mind sought to be proved is relevant and the prejudicial effect of the evidence does not outweigh its probative value." *State v. Locklear*, 320 N.C. 754, 760, 360 S.E.2d 682, 685 (1987). Under the state of mind exception, when intent is directly in issue, a declarant's statements "relative to his then existing intention are admitted without question." 2 Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 218, at 92 (4th ed. 1993); *see State v. Palmer*, 334 N.C. 104, 431 S.E.2d 172 (1993) (victim's statement that she would not give defendant money admissible to show motive to kill her); *Maynard*, 311 N.C. 1, 316 S.E.2d 197 (in this pre-Rules case, murder victim's statement that he would testify against defendant properly admitted as evidence of defendant's motive). Here, the victim's state of mind regarding his intention not to give defendant the money defendant wanted was relevant to the issue of defendant's motive. The testimony in question thus was admissible under the state of mind exception to the hearsay rule.

As to the testimony of Peele, defendant failed to object at trial and did not assign as error this part of the testimony among the transcript pages to which assignments of error were made. A failure to except or object to errors at trial constitutes a waiver of the right to assert the alleged error on appeal. *State v. Hartman*, 90 N.C. App. 379, 382, 368 S.E.2d 396, 398 (1988). Thus, defendant has waived this issue for appeal.

For the foregoing reasons, we hold that defendant received a fair trial, free from prejudicial error.

NO ERROR.