Justice MORGAN dissenting.
I respectfully dissent from the majority's determination that defendant's motion to dismiss the charge of attempted first-degree murder was improperly denied by the trial court. In applying the well-established legal standards to assess the sufficiency of evidence offered by the prosecution in a criminal case in the face of a defendant's motion to dismiss, I strongly disagree with the ultimate conclusion of my learned colleagues in the majority that there is "no evidence here to establish that defendant committed an overt act that, 'in the ordinary and likely course of things,' would have resulted in the killing." (Emphasis added.) I would affirm the decision of the Court of Appeals in this matter and agree with its well-reasoned analysis that defendant's acts under review satisfied the elements of an attempt to commit first-degree murder.
**766 It is well-established that
"[w]hen reviewing a defendant's motion to dismiss a charge on the basis of insufficiency of the evidence, this Court determines 'whether the State presented "substantial evidence" in support of each element of the charged offense.' " " ' " 'Substantial evidence' is relevant evidence that a reasonable person might accept as adequate, or would consider necessary to support a particular conclusion." ' " "In this determination, all evidence is considered ' "in the light most favorable to the State, and the State receives the benefit of every reasonable inference supported by that evidence." ' "... " '[I]f there is substantial evidence-whether direct, circumstantial, or both-to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied.' "
State v. Hunt , 365 N.C. 432, 436, 722 S.E.2d 484, 488 (2012) (quoting State v. Abshire , 363 N.C. 322, 327-28, 677 S.E.2d 444, 449 (2009) (citations omitted), superseded on other grounds by statute , An Act to Protect North Carolina's Children / Sex Offender Law Changes, ch. 247, Sec. 8(a), 2005 N.C. Sess. Laws (Reg. Sess. 2006) 1065, 1070-71, as recognized in State v. Barnett , 368 N.C. 710, 714-15, 782 S.E.2d 885, 889 (2016) ). "Any contradictions or conflicts in the evidence are resolved in favor of the State, and evidence unfavorable to the State is not considered." State v. Miller , 363 N.C. 96, 98, 678 S.E.2d 592, 594 (2009) (citations omitted). Both competent and incompetent evidence must be considered. State v. Allen , 279 N.C. 406, 407, 183 S.E.2d 680, 681 (1971). "[S]o long as the evidence supports a reasonable inference of the defendant's guilt, a motion to dismiss is properly denied even though the evidence also 'permits a reasonable inference of the defendant's innocence.' " Miller , 363 N.C. at 99, 678 S.E.2d at 594 (quoting State v. Butler , 356 N.C. 141, 145, 567 S.E.2d 137, 140 (2002) ).
"The elements of an attempt to commit any crime are: (1) the intent to commit the substantive offense, and (2) an overt act done for that purpose which goes beyond mere preparation, but (3) falls short of the completed offense." State v. Miller , 344 N.C. 658, 667, 477 S.E.2d 915, 921 (1996) (citations omitted). With regard to the second element, this Court has opined that:
*435 it is essential that the defendant, with the intent of committing the particular crime, should have done some overt **767 act adapted to, approximating, and which in the ordinary and likely course of things would result in the commission thereof. Therefore, the act must reach far enough towards the accomplishment of the desired result to amount to the commencement of the consummation. It must not be merely preparatory. In other words, while it need not be the last proximate act to the consummation of the offense attempted to be perpetrated, it must approach sufficiently near to it to stand either as the first or some subsequent step in a direct movement towards the commission of the offense after the preparations are made .
Id. at 668, 477 S.E.2d at 921 (quoting State v. Price , 280 N.C. 154, 158, 184 S.E.2d 866, 869 (1971) (emphasis added) ).
In applying these unassailable and fundamental legal principles to the unique facts which are presented in the instant case, in my view it is clear that the State has presented some evidence to establish that defendant committed an overt act that, in the ordinary and likely course of things, would have resulted in the killing of defendant's ex-wife, but for the intended "hitman" actually being an undercover law enforcement officer. As the majority notes, the evidence produced at trial by the State showed that defendant originally disclosed to his acquaintance Lawrence Sorkin that defendant was feeling pressured by defendant's ongoing child custody dispute with his ex-wife, that defendant was willing to pay Sorkin $200 to discuss something that would be "beneficial" to defendant, that defendant was tired of going to court, and that defendant reminded Sorkin of an earlier conversation between the two of them in which Sorkin had stated that Sorkin's father had connections to men who could "break a few legs." This discussion led Sorkin to fear that defendant was actively contemplating the prospect of bringing harm upon defendant's ex-wife. After this conversation, defendant was amenable to participating in a meeting that transpired less than a month later in which Sorkin arranged for defendant to talk with someone unknown to defendant-the undercover officer posing as a "hitman"-with said meeting occurring in a retail store parking lot, initiated by defendant's entry into an unknown person's car at Sorkin's direction after which defendant was immediately queried by the "hitman" about the presence of any recording device on defendant's person. Upon the request of the "hitman," defendant readily displayed the $2500 in cash which defendant was instructed to bring to the meeting. The unknown "hitman" asked for detailed information about defendant's ex-wife, which defendant readily provided: her name, address, cellular telephone number, and car description. Defendant also supplied photographs of his ex-wife **768 to the "hitman." In response to this individual's questions about the manner in which he could get the ex-wife alone, defendant gave the "hitman" the name of their daughter's elementary school, the times at which the ex-wife would drop off the child at said school, and he informed the "hitman" that the ex-wife was always alone in her car after the daughter was taken to school. After obtaining this information, the undercover officer posing as the "hitman" gave defendant specific instructions concerning the payment of the remaining balance of $7500 for the "hit" on defendant's ex-wife, the six-day duration of time in which the "hitman" would purchase a telephone and during which defendant should obtain a certain kind of telephone at a specified time and send a text message to the "hitman" from defendant's designated telephone, defendant's receipt of information on where to send the outstanding $7500 when "it's done," and defendant's need to destroy defendant's designated telephone "when we're done." The "hitman" went on to ask defendant where defendant wanted his ex-wife's dead body, and after a further exchange, defendant stated, "I need to be the sole parent making every decision with my daughter all the time, and no chance of any more court cases. Totally no chance." When the "hitman" assured defendant that the "hitman" could provide defendant with sole custody of his daughter if this was defendant's desire, defendant reiterated that he wanted sole custody. As to where defendant wanted his ex-wife's dead body and the manner in which defendant wanted the "hitman" *436 to "do it," defendant said, "[A]s long as there's no chance that I will answer questions or be involved, I want-I want to make sure that my daughter is with me all the time, only me, no chance of any further court cases or anything." Defendant then offered examples of school days and school time periods to the "hitman" at which times the "hit" could be accomplished in the absence of the daughter. On the subject posed by the "hitman" regarding how defendant "wanted it done," defendant replied, "I don't care about any details." Towards the end of the meeting, defendant voluntarily tendered the total sum of $10,000 for the killing of defendant's ex-wife to the "hitman," after which the "hitman" informed defendant that the two of them would have no further communication, and defendant would know when the ex-wife was dead. As the discussion ended, when the undercover law enforcement officer representing himself as the "hitman" told defendant that defendant's ex-wife could "disappear," defendant answered that he wanted her to "disappear." At that point, all but the actual "hit" was complete. From defendant's perspective, he had done all that he could do to achieve the murder of his ex-wife.
In light of the totality of these evidentiary facts adduced at trial, I would find that the State's presentation was sufficient to withstand **769 defendant's motion to dismiss the attempted first-degree murder charge and that the trial court correctly denied the motion. The State presented substantial evidence in support of each element of the charged offense of attempted first-degree murder. With the State's entitlement to the benefit of every reasonable inference supported by the evidence regarding whether or not defendant committed the criminal offense of attempted first-degree murder, it was up to the jury at trial to determine if defendant's state of mind, acts, statements, representations, suggestions, and offers-or the lack thereof-during his interactions with his acquaintance Sorkin and the undercover officer posing as a "hitman" all combined to render defendant guilty of the charged offense. In my view, the State in the case sub judice clearly established, in accordance with this Court's decision in Miller , that defendant had the intent to commit the substantive offense of first-degree murder of his ex-wife through his detailed arrangements with, and voluntary full payment of funds to, the supposed "hitman"; that defendant performed an overt act toward commission of the killing beyond mere preparation, by virtue of these detailed arrangements regarding the myriad of informational items supplied to the "hitman" about the ex-wife along with the full payment to the "hitman" of the price for the deadly deed; and that defendant had no part in the ultimate outcome here, namely the incompletion of the substantive offense of first-degree murder because of the actual non-existence of the "hitman" with whom defendant assumed he had hired to perform the killing.
The majority here adopts the position that the evidence at trial did not satisfy the second prong of the three-part Miller test regarding the elements of an attempt to commit a crime because no overt act by defendant rose to the level of an attempt beyond mere solicitation of the undercover officer posing as a "hitman" to perpetrate the killing. According to the majority's scale of measure, the evidentiary facts that I delineated earlier and which the Court of Appeals likewise identified in its opinion do not "amount to proof of overt acts amounting to attempt under our law" or constitute any overt act "apparently adapted to produce the result intended" because "the act of planning the killing and making an initial payment to the hired killer would not, without additional conduct, inexorably result in the commission of the offense in the 'ordinary and likely course of things.' " The majority further deems defendant's conduct to constitute only solicitation and not an overt act amounting to attempt because "although defendant and the supposed hired killer agreed to a 'criminal design,' neither defendant nor his apparent agent had begun to 'execut[e]' it at the time defendant exited the 'hitman's' car." I believe that the majority has unconsciously and unfortunately **770 elevated the commission of an overt act as an element of attempt with these analytical conclusions, because defendant's willingness to allow the "hitman" to choose among the plethora of times, places, and circumstances that defendant himself has identified as potential aspects of the killing and the futuristic *437 aspects of specific directives identified by the "hitman" regarding timelines of the perpetration of the plan, should not be deemed as fundamentally fatal to the prosecution's ability to allow the jury to determine whether or not defendant committed an overt act as an element of the offense of attempted first-degree murder. Under the circumstances presented in this case, particularly defendant's voluntary payment in full of the "hitman's" required sum, defendant had completed his role in his plan to murder his ex-wife.
For the reasons stated, I would affirm the opinion of the Court of Appeals in this case.
Chief Justice MARTIN and Justice NEWBY join in this dissenting opinion.