An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 25-346

Filed 18 February 2026

Union County, Nos. 20CR000197-890; 20CR000198-890

STATE OF NORTH CAROLINA

v.

ALLIJA DANIEL MASSEY, Defendant.

Appeal by defendant from judgment entered 24 January 2024 by Judge Jonathan Wade Perry in Union County Superior Court. Heard in the Court of Appeals 28 January 2026.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General Benjamin Szany, for the State.*

> *Anne Bleyman, for defendant-appellant.*

DILLON, Chief Judge.

Defendant Allija D. Massey challenges the judgment entered consistent with the jury's verdict convicting him of first-degree murder (under the felony murder rule) and attempted robbery with a dangerous weapon. Defendant contends the trial court erred in denying his motion to dismiss, asserting the evidence was insufficient to convict him of both felony murder and attempted robbery with a dangerous weapon.

For the forgoing reasoning, we conclude Defendant received a fair trial free from reversible error.

## I.    Background

On 26 January 2020, Victim, Alvin "Avenue" Brewer, was found at the Chase Apartments in Monroe lying face down on top of a revolver and breathing shallowly. Victim had been shot several times, walked from the place where he was shot, and fell near his vehicle in the apartment complex's parking lot. Victim later succumbed from his gunshot wounds.

After Monroe Police Department ("MPD") officers responded to and secured the scene, officers began their investigation with an on-scene interview of a neighbor, Ms. Allen, who saw the events from her second story apartment window. The next day, Ms. Allen was again interviewed, this time at the MPD station. There, she was shown a photo lineup and identified Defendant, in addition to providing investigators with other pertinent information.

Following MPD's investigation, Defendant was arrested and a grand jury subsequently indicted him on charges of first-degree murder, attempted robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon. A jury convicted Defendant of first-degree murder under the theory of felony murder and attempted robbery with a dangerous weapon. The trial court arrested judgment on the attempted robbery with a dangerous weapon charge (as the robbery was the

felony supporting Defendant's conviction for felony murder) and sentenced Defendant to life imprisonment without parole. Defendant appealed.

## II. Analysis

On appeal, Defendant argues his convictions must be vacated due to the insufficiency of the State's evidence offered at trial We disagree: the State offered more than a scintilla of evidence for the jury to conclude that Defendant was a perpetrator and committed each element of the two crimes.

### A. Standard of Review

We review a denial of a motion to dismiss de novo. *State v. Cox*, 367 N.C. 147, 151 (2013). "As a 'general rule,' a motion to dismiss should be denied if there is '*any* evidence' that 'tends[s] to prove' each element or 'reasonably conduces to [each element's] conclusion as a fairly logical and legitimate deduction' beyond mere 'suspicion or conjecture.'" *State v. Bracey*, 923 S.E.2d 540, 544 (N.C. 2025) (citation omitted) (alterations and emphasis in original).

Thus, "the question . . . is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense." *State v. Davenport*, 386 N.C. 454, 460 (2024) (citations omitted). *See also State v. Ford*, 923 S.E.2d 549, 554 (N.C. 2025). "Substantial evidence is the 'amount . . . necessary to persuade a rational juror to accept a conclusion.'" *State v. Beck*, 385 N.C. 435, 438 (2023) (citations omitted) (ellipses in original). "[T]he 'substantial evidence' standard requires only that there

be 'more than a scintilla of evidence.' " *Bracey*, 923 S.E.2d at 544 (citation and footnote omitted); *see also Ford*, 923 S.E.2d at 559 (Berger, J., concurring) ("[T]he 'more than a scintilla of evidence' standard is not a high bar.").

We view the evidence, and draw "every reasonable inference" from the evidence, in favor of the State. *Beck*, 385 N.C. at 438. "[C]ontradictions or conflicts in the evidence are resolved in favor of the State, . . . and evidence unfavorable to the State is not considered[.]" *State v. Miller*, 363 N.C. 96, 98 (2009) (citations omitted).

When evidence is circumstantial, "it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty." *State v. Powell*, 299 N.C. 95, 99 (1980) (citation omitted); *see also State v. Dover*, 381 N.C. 535, 547 (2022) ("A jury may make 'inferences on inferences' when determining whether 'the facts constitute the elements of a crime[ ]' and thus, 'circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence.' " (citations omitted) (cleaned up)).

### B. Attempted Robbery with a Dangerous Weapon

We begin by examining whether there was sufficient evidence to convict Defendant of attempted robbery with a dangerous weapon, which in turn permits us to assess whether Defendant was the perpetrator of the offense.

Generally, "[t]he elements of an attempt to commit a crime are: (1) the intent to commit the substantive offense, and (2) an overt act done for that purpose which

goes beyond mere preparation, but (3) falls short of the completed offense." *State v. Gillard*, 386 N.C. 797, 832 (2024) (citation omitted) (alteration removed). "An attempted robbery with a dangerous weapon occurs when a person, with the specific intent to unlawfully deprive another of personal property by endangering or threatening his life with a dangerous weapon, does some overt act calculated to bring about that result." *State v. Wilson*, 385 N.C. 538, 545 (2023) (citation omitted) (cleaned up); *see also State v. Miller*, 344 N.C. 658, 667 (1996). "A pistol, or a gun, is a deadly weapon[.]" *State v. Smith*, 187 N.C. 469, 470 (1924). Circumstantial evidence may permit an inference of specific intent. *Gillard*, 386 N.C. at 832.

At trial, the State offered the following evidence which tended to show Defendant attempted to rob Victim:

Two weeks prior to the shooting, Sergeant Purser of MPD saw social media posts on Defendant's public social media profiles in which he was holding a Smith and Wesson SD40 firearm with a black slide and a green frame.

On the night of Victim's death, 26 January 2020, Mr. Derek Miller was an inmate at the Union County jail subject to a $100,000.00 bond. In order to post bail, a bail bondsman would require approximately ten to fifteen percent of the bond.

That same night, Mr. Miller called Ms. Jakaiy Hammonds, Mr. Miller's girlfriend, on the jail phone, and the two discussed Ms. Hammond's ability to bond Mr. Miller out. During the conversation, Ms. Hammonds was driving her vehicle (a gray Dodge Charger), promised Mr. Miller he would be out that night, told Mr. Miller

she was joined by Elijah "Speedy" Bennett, Allija (presumably Defendant), and two women nicknamed Di and Kash, and finally asserted she would be meeting with "Avenue."[1] Regarding the meeting with "Avenue," Ms. Hammonds stated that Avenue "was going to give it all up." Additionally, Ms. Hammonds twice warned Mr. Miller to be careful about what was being discussed because they were communicating on a jail phone.[2]

Ms. Allen witnessed what transpired from her second story apartment, which overlooked the area where the shooting occurred. She told officers she heard a loud commotion, looked out her window, and saw a fight between two individuals, one of them being a white or Hispanic male and the other a "chubby black guy."[3] Soon after, another male joined the fight, and the "chubby black guy" managed to briefly separate himself from his attackers. Then, Ms. Allen heard several gunshots.

And, as recorded by nearby security cameras, around the time the 911 call occurred, a dark Dodge Charger was seen leaving the apartment complex and

---

[1] Defendant asserts the reference to "Allija" on the jail call could have been in reference to a third "Elijah," Elijah Sturdivant—a person identified in MPD's investigation into Defendant. However, when reviewing a defendant's motion to dismiss, "evidence unfavorable to the State is not considered." *Miller*, 363 N.C. at 98. Defendant (Allija) was known to be associated with Mr. Miller, Ms. Hammonds, and Speedy. To that end, taking the evidence in the light most favorable to the State and ignoring unfavorable evidence, the jury could have concluded that Defendant (Allija) was the individual referenced in the phone call instead of another Elijah, such as Elijah Sturdivant.

[2] There also was evidence of a second phone call shortly before the robbery between Ms. Hammonds and a male calling on behalf of Mr. Miller. In that call, Speedy spoke with the other individual and confirmed his identity. Defendant argues that this phone call bellies the conclusion that Defendant, Speedy, and Ms. Hammonds robbed Victim, but even assuming that is true, we must ignore such unfavorable evidence. *See Miller*, 363 N.C. at 98.

[3] An officer testified Victim was a "heavy set black male."

- 6 -

running a stop sign, all at a high rate of speed.

The following day, on 27 January 2020, an MPD officer interviewed Ms. Allen at the station. Ms. Allen provided Defendant's name when asked about the white or Hispanic male. Also during this interview, Ms. Allen participated in a photo lineup with an MPD officer in which she looked at several photos, identified Defendant, and stated, "This is him[,]" and provided a confidence level of 80%.[4] Additionally, Ms. Allen informed officers that Ms. Hammonds drove a gray Charger, and that she saw a gray Charger parked in front of Ms. Allen's apartment building during the shooting and that departed after the shooting.

The day following the shooting, officers began to recanvas the scene. Sergeant Purser located a .40 caliber Smith and Wesson SD40 firearm near the front of the apartment building where other officers previously discovered shell casings. The recovered firearm had a distinctive black and green color, uncommon to typical Smith and Wesson .40 caliber pistols, and was missing its magazine.

The discovery of the firearm led Sergeant Purser to reexamine Defendant's social media posts as well as posts of Defendant's associates. These posts revealed photos in which Defendant was holding the black and green firearm with the same

---

[4] Defendant attempts to undermine Ms. Allen's trial testimony by pointing out her inability to recall details of what transpired. Defendant also attempts to undermine Ms. Allen's photo identification by pointing to her trial testimony where Ms. Allen stated (1) the signature on the required paperwork was not hers and was "crazy" and (2) she did not recall what was meant by "80%." But again, when reviewing a defendant's motion to dismiss, "evidence unfavorable to the State is not considered." *Miller*, 363 N.C. at 98. Also, the State played Ms. Allen's interview for the jury for corroboration and contradictions purposes in which the jury saw Ms. Allen identify Defendant.

coloring as the firearm recovered at the scene. During Sergeant Purser's testimony, the jury saw social media photos where Defendant's gun is visible, the photos taken by Sergeant Purser of the gun at the scene of the murder, and the actual gun which was recovered.

For instance, throughout a rap video, Defendant was holding on to or had on his person the firearm with the black slide and green frame, and no other video participant held on to the firearm. And in a public Instagram video, Defendant's younger brother is seen holding a firearm similar to the one found at the scene until Defendant regains possession. Sergeant Purser then testified he noticed that in the public video with Defendant's younger brother, the firearm had an extended magazine which can fall out of the firearm easily.

Police also recovered from the scene three .40 caliber Smith and Wesson shell casings, one .40 caliber Smith and Wesson live round, and one 9-millimeter shell casing. Victim had three gunshot wounds and blunt force trauma to his face and hands. A short distance away, officers discovered an inside out hoodie in a nearby field. Upon closer inspection, the hoodie appeared to the officers to have blood on the sleeve. After testing, DNA found on the hoodie matched the DNA profiles of both Victim and Speedy.

Finally, a little less than a month after the shooting, Sergeant Purser responded to a location near the site of the shooting because a group of juveniles recovered a bookbag containing papers and a debit card with Victim's name on them.

Sergeant Purser was then directed to the area where the bookbag was found and discovered more papers with Victim's name.

Taken together, this evidence tends to show more than a "scintilla" of Defendant's guilt in that it indicates Defendant and others formulated a plan to rob Victim and attempted to effectuate that plan. Viewing the evidence in a light most favorable to the State and drawing all reasonable inferences in the State's favor, the jury heard evidence that *Defendant* (1) helped concoct a plan to rob Victim in order to obtain enough money for Mr. Miller's bond; (2) went to the Chase Apartments to rob Victim; (3) fought Victim prompting Defendant, Speedy, and Victim to exchange gun fire; (4) and left the apartment complex with Victim's bookbag. This conclusion is especially warranted considering MPD recovered a firearm with the same unique color scheme as the firearm Defendant posted on social media, MPD found several shell casings of the same caliber as the unique gun on scene and a hoodie containing Victim and Speedy's DNA in a nearby field, and Ms. Allen saw, and video cameras recorded, a vehicle matching Ms. Hammonds' gray Charger in the vicinity, all after Ms. Hammonds informed Mr. Miller that she was with both Defendant and Speedy and that he would be getting out on bail that night.

Thus, "substantial" evidence tends to show Defendant specifically intended to deprive Victim of his money by endangering or threatening Victim with a firearm, a dangerous weapon, to obtain money for Mr. Miller's bail, and committed the requisite overt act by approaching Victim, fighting Victim, shooting Victim, and leaving with

Victim's bookbag.

We note Defendant's reliance on *State v. McDowell,* 329 N.C. 363 (1991) is misplaced. In that case, our Supreme Court vacated the defendant's conviction of attempted armed robbery with a dangerous weapon reasoning that "the record is insufficient to show more than a suspicion that [the] defendant attempted to rob [the victim]." *Id.* at 390. In an admitted pretrial statement to his lawyer, one co-defendant stated the defendant told him, "[the defendant] was going to get him some money even if he had to burn somebody." *Id.* at 389. However, when the co-defendants testified at trial, one stated the defendant merely asked if his co-defendants "were 'down to make money[,]' " and the other confirmed the defendant said he wanted to "burn" someone but did not reference a robbery. *Id.* at 389–90. And what bellied the State's theory that the defendant unsuccessfully robbed the victim, was the fact that the victim's purse was "left undisturbed on the front seat of her car[.]" *Id.* at 390. Thus, according to our Supreme Court, the evidence was "insufficient to support a reasonable inference of [the] defendant's guilt of armed robbery." *Id.*

Between the plan to obtain bail money, the fight between Defendant and Victim, and Victim's bookbag discovered by police, this case diverges from *McDowell,* thereby permitting the jury to draw a reasonable inference of Defendant's guilt.

Finally, the trial court also provided the jury with an acting in concert jury instruction. "The acting in concert doctrine allows a defendant acting with another

person for a common purpose of committing some crime to be held guilty of a murder committed in the pursuit of that common plan . . . ." *State v. Gillard*, 386 N.C. 797, 836 (2024) (citation omitted) (ellipses in original); *see also Wilson*, 385 N.C. at 546 ("[A] person who works together with another to bring about a criminal objective may be convicted of the same crime as the one who actually perpetrates the criminal act."); *State v. Barts*, 316 N.C. 666, 688–89 (1986). "Under this theory, two or more persons, who joined together in a purpose to commit a crime, are responsible for the unlawful acts committed by the other person, so long as those acts are committed in furtherance of the crime's common purpose." *State v. Baldwin*, 276 N.C. App. 368, 373 (2021) (citing *State v. Calderon*, 242 N.C. App. 125, 135 (2015)).

Thus, because there was evidence of Defendant and Speedy's common plan to rob Victim in order to raise money for Mr. Miller's bond, the jury also could have found Defendant guilty of attempted robbery with a dangerous weapon by acting in concert with Speedy, even if Speedy committed the robbery. *See State v. Barts*, 316 N.C. 666, 689 (1986) (upholding convictions for first-degree murder under the felony murder rule and robbery with a dangerous weapon because there was sufficient evidence a co-defendant, with whom the defendant was acting in concert with, "perpetrated the robbery in furtherance of the common plan to rob [the victim]"). Accordingly, the trial court properly denied Defendant's motion to dismiss as it concerned the attempted robbery with a dangerous weapon charge.

C.  Felony Murder

Next, we turn to the issue of whether there was sufficient evidence to convict Defendant of felony murder.

"Felony murder is a murder 'committed in the perpetration or attempted perpetration of any arson, rape or sex offense, *robbery*, kidnapping, burglary, or *other felony committed or attempted with the use of a deadly weapon.*'" *State v. Wilson*, 385 N.C. 538, 545 (2023) (quoting N.C.G.S. § 14-17(a)) (emphasis in the original); *see also State v. Maldonado*, 241 N.C. App. 370, 376 (2015).  A defendant may be found guilty of first-degree murder under a theory of felony murder if:

> (1) [the] defendant, or someone with whom the defendant was acting in concert, committed or attempted to commit a predicate felony under [G.S. 14-17(a)]; (2) [ ] a killing occurred "in the perpetration or attempted perpetration" of that felony; and (3) [ ] the killing was caused by the defendant or a co-felon.

*Maldonado*, 241 N.C. at 376 (citation and footnote omitted).

"A killing is committed in the perpetration or attempted perpetration of a felony . . . where there is no break in the chain of events leading from the initial felony to the act causing death, so that the homicide is part of a series of incidents which form one continuous transaction." *State v. Fields*, 315 N.C. 191, 197 (1985) (citation omitted); *see also State v. Parker*, 350 N.C. 411, 423 (1999) ("[A]ll that is required is that the elements of the underlying offense and the murder occur in a time frame that can be perceived as a single transaction." (citations and quotation marks

omitted)). "It is not necessary to support a conviction of felony-murder that [the] defendant actually inflicted the fatal shot." *State v. Peplinski*, 290 N.C. 235, 240 (1976).

As established above, the State offered evidence demonstrating Defendant attempted to rob Victim with a dangerous weapon, a felony listed under G.S. 14-17(a), thereby satisfying the predicate felony element. Additionally, Victim suffered from three gunshot wounds during the attempted robbery and subsequently died from his gunshot wounds, thereby establishing the requisite killing. Moreover, because the shooting occurred during the attempted robbery, these two "incidents" constituted a "continuous transaction" where there was "no break in the chain of events." *See Fields*, 315 N.C. at 197. And the State's evidence, as mentioned above, established that Defendant was the shooter, thereby satisfying the final element. Accordingly, the State presented substantial evidence permitting the jury to find Defendant guilty of first-degree murder under the felony murder rule.

Again, the trial court gave the jury an acting in concert instruction, which would also apply to Defendant's first-degree murder conviction. So, while there is evidence which permits the jury to conclude Defendant himself robbed Victim with a dangerous weapon, there is also evidence that would permit the jury to conclude Defendant and Speedy acted in concert with the common plan of robbing Victim and that Speedy shot and killed Victim. Therefore, Defendant could have been found guilty of first-degree murder because of Speedy's shooting of Victim while in their

pursuit of their common plan.

III.    Conclusion

We conclude there was sufficient evidence admitted to go to the jury on both the attempted robbery charge and the felony murder charge. It was appropriate to submit both charges to the jury even though the felony murder charge was based on the attempted robbery, as it is possible the jury may have found Defendant guilty of only the attempted robbery. But after the jury convicted Defendant of both charges, the trial court properly arrested judgment on the attempted robbery charge. Accordingly, we conclude Defendant received a fair trial, free from reversible error.

NO ERROR.

Judges TYSON and CARPENTER concur.

Report per Rule 30(e).