IN THE SUPREME COURT OF NORTH CAROLINA

No. 253PA17

Filed 7 December 2018

STATE OF NORTH CAROLINA

v.

DARRELL LEE MELTON

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous, unpublished decision of the Court of Appeals, ___ N.C. App. ___, 801 S.E.2d 392 (2017), finding no error after appeal from judgments entered on 21 April 2016 by Judge Mark E. Powell in Superior Court, Transylvania County. Heard in the Supreme Court on 15 May 2018 in session in the Henderson County Historic Courthouse in the City of Hendersonville, pursuant to section 18B.8 of Chapter 57 of the 2017 North Carolina Session Laws.

*Joshua H. Stein, Attorney General, by Matthew Tulchin, Special Deputy Attorney General, for the State.*

*Glenn Gerding, Appellate Defender, by Kathryn L. VandenBerg, Assistant Appellate Defender, for defendant-appellant.*

HUDSON, Justice.

This case comes to us by way of defendant's petition for discretionary review of the Court of Appeals' decision. Specifically, defendant has asked us to determine whether the Court of Appeals erred by (1) upholding defendant's conviction for

attempted murder, and (2) holding that punishing defendant for both solicitation and attempted murder based on the same conduct did not violate double jeopardy. We hold that the Court of Appeals erred in upholding defendant's conviction for attempted murder, and accordingly, we reverse the decision of the Court of Appeals. Because of this holding, we need not reach the double jeopardy issue.

## I.    **Factual and Procedural Background**

The scene underlying this case began when defendant left telephone messages for an acquaintance, Lawrence Sorkin, in late fall of 2014 and January of 2015. At the time, defendant was involved in an ongoing child custody dispute with his former wife. In his first message, defendant asked if he could have a few minutes of Sorkin's time to discuss something that would be "beneficial" to defendant. In the message in January, defendant stated that he would be willing to give Sorkin $200 for his time. The two agreed to meet at a Waffle House in Brevard in late January.

When they met, Sorkin mentioned defendant's offer of $200 and told defendant that the payment was not necessary; defendant paid the restaurant bill, and they continued their conversation near defendant's car. While they were outside, defendant told Sorkin that he was feeling pressured by his child custody case, that he felt it was not getting any better, and that he was tired of going to court. According to Sorkin, defendant also recalled an earlier conversation between them in which Sorkin jokingly recalled that his father mentioned he had connections to some men

in Jacksonville, Florida who could "break a few legs." By the end of the conversation, Sorkin feared that defendant meant to hurt his former wife.

Later that same day, Sorkin went to the Transylvania County Sheriff's Department to report his discussion with defendant. From that point on, Sorkin cooperated with the Sheriff's Office and helped arrange a meeting between defendant and an undercover officer in a Walmart parking lot. Sorkin's role in arranging the meeting involved multiple telephone conversations and in-person meetings with defendant, in which Sorkin acted as if he was contacting a "resource" on defendant's behalf who could "take care of the matter however [defendant] wanted."

The meeting between defendant and the undercover officer at the Walmart parking lot occurred on 3 February 2015. Sorkin was also present, and he directed defendant to the undercover officer's car. Sorkin left immediately after defendant made contact with the officer. When defendant entered the car, the officer, playing the role of a hired killer, scanned defendant and asked him if he had a wire or a recording device. Later, defendant mentioned the $2,500 that he was told to bring to the meeting. The officer instructed defendant to show him the money.

After seeing the money, the officer began to ask defendant questions about his former wife. Defendant provided her name, address, and cell phone number. At some point during the meeting, defendant also provided pictures of his former wife. The officer then asked defendant how he could "get" defendant's former wife "by herself."

In response, defendant gave the undercover officer the name of his daughter's elementary school and the drop-off times at the school. In response to questions, defendant then gave a description of his former wife's car and informed the officer that she was always alone in the car after she dropped their daughter off at school.

Next, the undercover officer instructed defendant on how they would communicate and how defendant would pay the remaining $7,500. Specifically, the officer told defendant that he had just purchased a phone that he would have for six days only. He told defendant that in two days, defendant should buy a "Verizon burn phone," and text him from that number. The officer told defendant that, "[w]hen it's done," he would instruct defendant on where to send the remaining $7,500. The officer then told defendant that "when we're done," defendant should destroy the Verizon burn phone.

After giving defendant these last instructions, the undercover officer asked defendant where he wanted his former wife's dead body. Defendant responded that he was "having trouble understanding." After this response, the officer asked defendant, "Why am I here?" and defendant responded, "I need to be the sole parent making every decision with my daughter all the time, and no chance of any more court cases. Totally no chance." The officer then stated that he was not a lawyer, and defendant indicated that he understood that. While pushing defendant to clarify his intent, the officer told defendant that if he wanted sole custody, he could "give

[defendant] sole custody." Defendant responded that he wanted sole custody. Then after again being asked where he wanted his former wife's dead body and how defendant "want[ed] [him] to do it," defendant told the officer that "as long as there's no chance that I will answer questions or be involved, I want – I want to make sure my daughter is with me all the time, only me, no chance of any further court cases or anything." Defendant ultimately told the officer that he did not "want any bodies moved."

After stating that he did not want any bodies moved, defendant explained to the undercover officer how he could do the job without defendant's daughter being present. Defendant said, "I pick [my daughter] up Monday, and she's with me. Six days is – what's we're in. During school is fine. Thursday is a half day, they got off at noon." After the officer asked defendant again how he "want[ed] it done," defendant ultimately responded, "I don't care about any details."

Before defendant left the vehicle, the undercover officer asked whether defendant would have any trouble acquiring the rest of the $7,500. Defendant responded that he had the full $10,000 with him, and he gave it to the officer. After defendant handed over the money, the officer told him they would have no more communication and that defendant would know once his former wife was dead. Next, the officer asked defendant if the $10,000 was all from one bank. Defendant responded that the money was withdrawn at "[d]ifferent times" and that he "saved a

while." The officer next said to defendant that his former wife could "disappear . . . Thursday or not." Defendant then responded "Yes, sir" to whether "Thursday it is okay?" At that point, defendant left the officer's car, and he was arrested as he returned to his own car. At the time of defendant's arrest, the undercover officer had left the Walmart parking lot.

Following his arrest, defendant was indicted on 9 February 2015 on charges of attempted first-degree murder and solicitation to commit first-degree murder. Defendant filed a motion to continue on 7 April 2016 requesting more time to obtain a neuropsychiatrist to examine the results of an MRI done on defendant's brain. The court denied defendant's motion to continue.[1] Defendant's trial began on 18 April 2016, and the facts summarized above were placed into evidence, primarily through the testimonies of Sorkin, the undercover officer who met with defendant, and defendant himself.

At the close of the State's evidence, defendant moved to dismiss, arguing that "attempted murder . . . . falls outside of the purview of the statute under the evidence . . . here." The motion was denied. At the close of all evidence, defendant renewed his motion to dismiss, arguing that "on the attempted murder charge . . . the act or

---

[1] Defendant supplemented his Motion to Continue at trial by requesting extra time to review discovery that he had received from the prosecutor the previous week and that he had been having trouble accessing. The Court withheld ruling on this motion until defendant was able to review the discovery during a break in the trial. Defense counsel did not renew this motion.

the res that is being used, as I understand it . . . was in point of fact subsumed in the solicitation and not indicative of an attempt." The court denied defendant's renewed motion to dismiss.

The jury found defendant guilty of attempted first-degree murder and solicitation to commit first-degree murder. The court sentenced him to a term of 157 to 201 months for attempted first-degree murder and a consecutive term of 58 to 82 months for solicitation to commit first-degree murder. Defendant gave oral notice of appeal at trial.

The Court of Appeals first held that the trial court did not err in denying defendant's motion to dismiss the attempted murder charge because there was "sufficient evidence of an overt act to permit the case to go to the jury." *State v. Melton*, ___ N.C. App. ___, 801 S.E.2d 392, 2017 WL 2644445, at \*2 (2017) (unpublished). Specifically, the Court of Appeals concluded that the evidence sufficiently showed an overt act because "[defendant] hired another man to kill his ex-wife." *Melton*, 2017 WL 2644445, at \*2. The Court of Appeals also pointed to evidence indicating that defendant "provid[ed] details to ensure that the killer could carry out that act." *Id.* The Court of Appeals recognized that such details included

> his ex-wife's name, phone number, and daily routine; a photograph of her; and a description of her car. Melton gave the man a specific day to carry out the murder and even discussed what to do with the body. Finally, Melton gave the man $10,000 to pay for the murder. He then got out of the man's car and walked away, believing the murder

would be carried out.

*Id.* Based on this evidence, the Court of Appeals reasoned that defendant had committed an overt act because, "[a]t that point, Melton had taken every step necessary to complete this contract killing." *Id.* The Court of Appeals added:

> All that remained was for the hitman (had he not been an undercover agent) to kill Melton's ex-wife. Melton provided the killer with everything he needed to complete the job, including key information on the target and the money to pay for the deed. In short, Melton took a key "step in a direct movement towards the commission of the offense[.]"

*Id.* (brackets in original) (quoting *State v. Parker*, 224 N.C. 524, 526, 31 S.E.2d 531, 531-32 (1944), *overruled in part on other grounds by State v. Hageman*, 307 N.C. 1, 14 n.1, 296 S.E.2d 433, 441 n.1 (1982)).

Additionally, the Court of Appeals observed without elaboration that "our holding is consistent with those in other jurisdictions, which uniformly hold that, although mere solicitation is insufficient to constitute attempt, specific acts taken to complete a murder-for-hire, such as those taken by [defendant] here, can satisfy the elements of attempted murder." *Id.* at *3 (citations omitted).

Second, the Court of Appeals held that the trial court did not violate defendant's right to be free from double jeopardy in punishing him for both solicitation and attempted murder based on the same conduct because "[e]ach of these two offenses 'requires proof of [an additional] fact which the other does not.' " *Id.* (quoting *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 182, 76 L. Ed.

306, 309 (1932)). Specifically, the Court of Appeals observed that "[a]ttempt, unlike solicitation, requires an overt act," *id.* (quoting *State v. Clemmons*, 100 N.C. App. 286, 290, 396 S.E.2d 616, 618 (1990)), and "[s]olicitation, unlike attempt, requires 'enticing or inducing' another to commit a crime." *Id.* (quoting *State v. Tyner* 50 N.C. App. 206, 207, 272 S.E.2d 626, 627 (1980), *disc. rev. denied,* 302 N.C. 633, 280 S.E.2d 451 (1981)).

Following the decision by the Court of Appeals, defendant filed a petition for discretionary review, which we allowed on 1 November 2017. In his petition, defendant requested that we examine whether the Court of Appeals erred by (1) upholding defendant's conviction for attempted murder, and (2) holding that there was no double jeopardy violation in punishing defendant for both solicitation and attempted murder based upon the same conduct. We conclude that the evidence was insufficient to show that defendant committed attempted murder as defined by North Carolina law. Therefore, we reverse the decision upholding the denial of defendant's motion to dismiss the attempted murder charge. Because of this holding, we need not address the double jeopardy issue.

## II.    Analysis

We first conclude here that the Court of Appeals' reliance upon cases from other jurisdictions, all of which have statutory frameworks different from our own, provides inadequate support for its decision. Second, but more important, we conclude that under North Carolina law, the State's evidence adequately showed

solicitation but fell short of showing the required overt acts for attempted first-degree murder, so that defendant's motion to dismiss that charge should have been allowed.

This Court reviews the decision of the Court of Appeals to determine whether it contains any errors of law. N.C. R. App. P. 16(a); *State v. Mumford*, 364 N.C. 394, 398, 699 S.E.2d 911, 914 (2010) (citation omitted). "In ruling on a motion to dismiss, the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Chekanow*, 370 N.C. 488, 492, 809 S.E.2d 546, 549 (2018) (quoting *State v. Mann,* 355 N.C. 294, 301, 560 S.E.2d 776, 781, *cert. denied*, 537 U.S. 1005, 123 S. Ct. 495, 154 L. Ed. 2d 403 (2002)). "Substantial evidence is that amount of relevant evidence necessary to persuade a rational juror to accept a conclusion." *Id.* at 492, 809 S.E.2d at 549 (quoting *Mann*, 355 N.C. at 301, 560 S.E.2d at 781)). "In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *Id.* at 492, 809 S.E.2d at 549-50 (quoting *State v. Rose*, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994), *cert. denied,* 515 U.S. 1135, 115 S. Ct. 2565, 132 L. Ed. 2d 818 (1995)). "Whether the State presented substantial evidence of each essential element of the offense is a question of law; therefore, we review the denial of a motion to dismiss de novo." *Id.* at 492, 809 S.E.2d at 550 (quoting *State v. Crockett*, 368 N.C. 717, 720, 782 S.E.2d 878, 881 (2016)).

### A. **The Court of Appeals Relied on Inapposite Case Law from Other Jurisdictions in Concluding Defendant Committed Attempted Murder.**

Under North Carolina law, "[t]he elements of an attempt to commit any crime are: (1) the intent to commit the substantive offense, and (2) an overt act done for that purpose which goes beyond mere preparation, but (3) falls short of the completed offense." *State v. Miller*, 344 N.C. 658, 667, 477 S.E.2d 915, 921 (1996) (first citing *State v. Collins*, 334 N.C. 54, 431 S.E.2d 188 (1993); then citing *State v. Smith*, 300 N.C. 71, 265 S.E.2d 164 (1980)).

The general rule in North Carolina for determining when conduct constitutes an overt act has developed at common law:

> In order to constitute an attempt, it is essential that the defendant, with the intent of committing the particular crime, should have done some overt act adapted to, approximating, and which in the ordinary and likely course of things would result in the commission thereof. Therefore, the act must reach far enough towards the accomplishment of the desired result to amount to the commencement of the consummation. It must not be merely preparatory. In other words, while it need not be the last proximate act to the consummation of the offense attempted to be perpetrated, it must approach sufficiently near to it to stand either as the first or some subsequent step in a direct movement towards the commission of the offense after the preparations are made.

*Id.* at 668, 477 S.E.2d at 921 (quoting *State v. Price*, 280 N.C. 154, 158, 184 S.E.2d 866, 869 (1971)); *see Parker*, 224 N.C. at 525-26, 31 S.E.2d at 531-32; *State v. Addor*,

183 N.C. 687, 689, 110 S.E. 650, 651 (1922).

Although our General Assembly has not defined this offense in a statutory enactment as other states have done, the legislature has clearly expressed its policy preferences that solicitation and attempt are two different crimes and that attempt is to be punished more harshly than solicitation. N.C.G.S. § 14-2.5 (2017) ("Unless a different classification is expressly stated, an attempt to commit a misdemeanor or a felony is punishable under the *next lower* classification as the offense which the offender attempted to commit. An attempt to commit a Class A or Class B1 felony is a Class B2 felony, an attempt to commit a Class B2 felony is a Class C felony, an attempt to commit a Class I felony is a Class 1 misdemeanor, and an attempt to commit a Class 3 misdemeanor is a Class 3 misdemeanor." (emphasis added)); *id.* § 14-2.6(a) (2017) ("Unless a different classification is expressly stated, a person who solicits another person to commit a felony is guilty of a felony that is *two classes lower* than the felony the person solicited the other person to commit, except that a solicitation to commit a Class A or Class B1 felony is a Class C felony, a solicitation to commit a Class B2 felony is a Class D felony, a solicitation to commit a Class H felony is a Class 1 misdemeanor, and a solicitation to commit a Class I felony is a Class 2 misdemeanor."(emphasis added)). We may or may not agree with these policy choices, but we are not a legislative body and decline to engage in that analysis here.

In support of its conclusion that defendant committed an overt act, the Court of Appeals relied on several cases from other jurisdictions that it says "uniformly hold

that, although mere solicitation is insufficient to constitute attempt, specific acts taken to complete a murder-for-hire, such as those taken by [defendant] here, can satisfy the elements of attempted murder." *Melton*, 2017 WL 2644445, at *3 (citing *State v. Mandel,* 78 Ariz. 226, 229-30, 278 P.2d 413, 416 (1954)); *People v. Superior Court,* 41 Cal. 4th 1, 11-12, 157 P.3d 1017, 1024 (2007); *Howell v. State,* 157 Ga. App. 451, 454-55, 278 S.E.2d 43, 46 (1981) (*cert. denied*, Apr. 10, 1981); *State v. Montecino,* 2004-0892, pp. 7-8 (La. App. 1 Cir. 2/11/05); 906 So. 2d 450, 454, *cert. denied,* 2005-0717 (La. 6/3/05); 903 So. 2d 456; *State v. Group,* 98 Ohio St. 3d 248, 2002-Ohio-7247, 781 N.E.2d 980 at ¶96. Having carefully considered these decisions, we conclude that to the extent the Court of Appeals relied on them, it erred because each comes from a jurisdiction whose attempt law is derived from a statutory framework materially different than our own.

Two of these decisions are from Georgia and Ohio, jurisdictions that have generally adopted the Model Penal Code (MPC). *See Howell,* 157 Ga. App. at 456, 278 S.E.2d at 47 (stating that the "substantial step" language in Georgia's criminal code was adopted from the MPC); *see also Group*, 98 Ohio St. 3d 248, 2002-Ohio-7247, 781 N.E.2d, at ¶¶ 101-102 (quoting and citing *State v. Woods*, 48 Ohio St. 2d 127, 132, 357 N.E.2d 1059, 1063 (1976), *judgment vacated and case remanded,* 438 U.S. 910, 98 S. Ct. 3133, 57 L. Ed. 2d 1153 (1978), which adopted the MPC's "substantial step" test to determine when an overt act has been committed). The MPC has been recognized as "broaden[ing] the scope of attempt liability." 2 Wayne R. LaFave,

*Substantive Criminal Law* § 11.4(e), at 313 (3d ed. 2018) [hereinafter LaFave, *Substantive Criminal Law*] (citing Model Penal Code § 5.01 cmt. 6, at 329-30 (Am. Law Inst. 1985)); *see also Howell*, 157 Ga. App. at 456, 278 S.E.2d at 47 ("It is expected, in the normal case, that this approach will broaden the scope of attempt liability."). This broader scope of liability appears to result from the MPC's distinct concern with "restraining dangerous persons." LaFave, *Substantive Criminal Law* § 11.4(e), at 313 (citing Model Penal Code § 5.01 cmt. 6, at 329-30); *see also* Model Penal Code § 5.01(2), at 296 (stating that conduct will satisfy the Code's "substantial step" test if it is "strongly corroborative of the actor's criminal purpose"). In addition to widening the scope of attempt liability, the MPC switches the focus of the attempt analysis to "what the actor has already done rather than what remains to be done." LaFave, *Substantive Criminal Law* § 11.4(e), at 313; *see also State v. Daniel B.*, 164 Conn. App. 318, 328-29, 137 A.3d 837, 846 (2016); *People v. Hawkins*, 311 Ill. App. 3d 418, 424, 723 N.E.2d 1222, 1226-27 (2000); *State v. Lammers*, 479 S.W.3d 624, 633 (Mo. 2016) (en banc).

North Carolina has not adopted the MPC approach to attempt, nor has our legislature defined attempt by statute; instead, our definition of attempt has developed from the common law, which differs from the MPC approach in important respects. Specifically, our common law definition of attempt does not include conduct that is merely "*strongly corroborative* of the actor's criminal purpose." Model Penal Code § 5.01(2), at 296 (emphasis added). Our attempt law includes as overt acts

conduct that "stand[s] either as the first or some subsequent step in *a direct movement towards the commission of the offense* after the preparations are made." *Miller*, 344 N.C. at 668, 477 S.E.2d at 921 (emphasis added) (quoting *Price*, 280 N.C. at 158, 184 S.E.2d at 869); *see Parker*, 224 N.C. at 526, 31 S.E.2d at 531-32; *Addor*, 183 N.C. at 689, 110 S.E. at 651. Simply put, our attempt law requires conduct more overt than that required under the MPC. Also, in determining whether the conduct is a "first or some subsequent step," our approach considers what remains to be done, and therefore differs in focus from the MPC. *Miller*, 344 N.C. at 668, 477 S.E.2d at 921 (quoting *Price*, 280 N.C. at 158, 184 S.E.2d at 869); *see Parker*, 224 N.C. at 526, 31 S.E.2d at 531; *Addor*, 183 N.C. at 689, 110 S.E. at 651.

Two of the other cases mentioned by the Court of Appeals are from jurisdictions that allow an overt act to be shown by "slight acts" when an intent to commit a crime is "clearly shown." *Mandel*, 78 Ariz. at 228, 278 P.2d at 415 (citations omitted); *People v. Superior Court*, 41 Cal. 4th at 8, 157 P.3d at 1022 (citations omitted). As noted above, North Carolina's attempt law varies from the MPC; our law also differs from the slight acts approach. Beyond mere "slight acts in furtherance" of a criminal intent, *Mandel*, 78 Ariz. at 228, 278 P.2d at 415 (citations omitted); *People v. Superior Court*, 41 Cal. 4th at 8, 157 P.3d at 1022 (citations omitted), our Court has required a defendant's conduct to "stand either as the first or some subsequent step in a direct movement towards the commission of the offense after the preparations are made." *Miller*, 344 N.C. at 668, 477 S.E.2d at 921 (quoting *Price*, 280 N.C. at 158, 184 S.E.2d

at 869); *see Parker*, 224 N.C. at 526, 31 S.E.2d at 531-32; *Addor*, 183 N.C. at 689, 110 S.E. at 651.[2]

Finally, the Court of Appeals cited a case from Louisiana, a jurisdiction whose attempt statute did not require the defendant to have committed an act that would "have actually accomplished" the criminal purpose. *See Montecino*, 2004-0892 at p. 6; 906 So.2d at 453 ("Any person who . . . does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt . . . and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose." (quoting La. Rev. Stat. Ann. § 14:27(A) (2005))). Unlike the approach in *Montecino*, North Carolina law requires a defendant to commit an act that "in the ordinary *and likely* course of things *would result in the commission thereof." Miller*, 344 N.C. at 668, 477 S.E.2d at 921 (emphases added) (quoting *Price*, 280 N.C. at 158, 184 S.E.2d at 869; *see Parker*, 224 N.C. at 525, 31 S.E.2d at 531; *Addor*, 183 N.C. at 689, 110 S.E. at 651.

For the above reasons, we conclude that the cases from other jurisdictions

---

[2] It should be noted that we have quoted "slight acts" language in at least one prior case, *State v. Bell*, 311 N.C. 131, 141, 316 S.E.2d 611, 616 (1984) ("[W]henever the design of a person to commit a crime is clearly shown, slight acts in furtherance of the design will constitute an attempt." (quoting 21 Am. Jur. 2d *Criminal Law* § 159, at 316 (1981)); however, we have not adopted this approach for determining when an overt act has occurred. In *Bell* this language was included in our analysis of intent, not overt acts, and we included it to demonstrate that an intent to commit the underlying offense can be shown from the commission of an overt act. *See id.* at 140-41, 316 S.E.2d at 616 ("While it is true that the actual physical assault on [the victim] took place outside the presence of [the defendant], we nevertheless believe that . . . the attempt was complete upon [the] defendant's act in ordering the women to remove their clothes, an act which served to make the intent unequivocal.").

referenced and relied on by the Court of Appeals are rooted in jurisprudence inconsistent with the North Carolina legal framework and definition of attempt. Accordingly, we decline to follow this approach.

## B. **The Evidence Did Not Show an "Overt Act" Amounting to Attempt as Defined By North Carolina Law.**

As discussed already, our legislature has not chosen to statutorily define the crime of attempt, although it has set forth the punishment structure. The contours of our law of attempt have thus evolved through the common law.

Our common law has developed several guidelines to distinguish acts of preparation from overt acts. In *Addor* we quoted the decision of the California Supreme Court in *People v. Murray* which provided that "[b]etween preparation for the attempt and the attempt itself[ ] there is a wide difference. The preparation[s] consist[ ] in devising or arranging the means or measures necessary for the commission of the offense[.] [T]he attempt is the direct movement toward[s] the commission after the preparations are made." *Addor*, 183 N.C. at 690, 110 S.E. at 651 (quoting *People v. Murray*, 14 Cal. 159, 159, 1859 WL 1186, at *1 (1859)). We then applied this test to determine that "the alleged attempt did not amount to a direct ineffectual act towards the present manufacture of spirituous liquors, to a 'commencement of the consummation,' " *id.* at 690, 110 S.E. at 652 (quoting *Hicks v. Commonwealth,* 86 Va. 223, 226, 9 S.E. 1024, 1025 (1889)), "but, as indicated in the opinion of *Chief Justice Field*s in the *California* case, the said acts consisted only in

'devising or arranging the means or measures necessary [to] the commission of the offense.' " *Id.* at 690, 110 S.E. at 652 (quoting *Murray*, 14 Cal. at 159, 1859 WL 1186, at *1).

Furthermore, in both *Addor* and *Parker* we stated that an overt act is committed when the act is, at least, "in part execution of a criminal design." *Parker*, 224 N.C. at 526, 31 S.E.2d at 532 (citations omitted); *Addor*, 183 N.C. at 688, 110 S.E. at 650 (citation omitted). Additionally, in both *Addor* and *Parker* we concluded that an overt act occurs when the act is "apparently adapted to produce the result intended." *Parker,* 224 N.C. at 526, 31 S.E.2d at 532 (citing *Addor,* 183 N.C. at 689, 110 S.E. at 651).

The Court of Appeals concluded that defendant attempted to kill his former wife by taking the following steps: (1) hiring another man to kill his former wife, (2) providing him the details necessary to complete the killing, (3) helping the hired killer formulate a plan to kill his former wife, and (4) paying the hired killer to commit the killing. *Melton*, 2017 WL 2644445, at *2. The Court of Appeals reasoned that "[a]ll that remained was for the hitman (had he not been an undercover agent) to kill [defendant's] ex-wife." *Id.*

We are not persuaded that the Court of Appeals properly applied our common law to these facts; while the evidence of defendant's conduct does show a completed solicitation, his actions fall short of an overt act constituting attempt. Specifically, in meeting with the supposed hired killer, tendering the $2,500 in cash as an initial

payment, providing the hired killer the details necessary to complete the killing of defendant's former wife, and helping the hired killer plan how to get his former wife alone and how to kill her out of the presence of their daughter, defendant engaged in ample and horrifying acts of solicitation. "The gravamen of the offense of soliciting lies in counseling, enticing or inducing another to commit a crime." *State v. Furr*, 292 N.C. 711, 720, 235 S.E.2d 193, 199 (citation omitted), *cert. denied,* 434 U.S. 924, 98 S. Ct. 402, 54 L. Ed. 2d 281 (1977). Furthermore, evidence can still prove solicitation "when the solicitation is of no effect." *State v. Hampton*, 210 N.C. 283, 284, 186 S.E. 251, 252 (1936). The evidence here reveals that, intending that his wife be killed, defendant counseled the hired killer concerning how to complete that criminal objective. Moreover, evidence established that defendant enticed and induced the hired killer to commit the crime by tendering the $2,500 initial payment.

Nonetheless, evidence of these preparatory acts, calculating as they are, does not amount to proof of overt acts amounting to attempt under our law. Specifically, by providing details to the supposed hired killer to carry out the killing and giving him an initial payment, defendant certainly "devis[ed] or arrang[ed] the means or measures necessary for the commission of the offense." *Addor*, 183 N.C. at 690, 110 S.E. at 651 (quoting *Murray*, 14 Cal. at 159, 1859 WL1186, at *1). Yet, at that point, defendant had not begun to "execut[e]" the "criminal design" that he helped concoct. *Parker*, 224 N.C. at 526, 31 S.E.2d at 532; *Addor*, 183 N.C. at 688, 110 S.E. at 650. Moreover, the act of planning the killing and making an initial payment to the hired

killer would not, without additional conduct, inexorably result in the commission of the offense in the "ordinary and likely course of things." *Miller*, 344 N.C. at 668, 477 S.E.2d at 921 (quoting *Price*, 280 N.C. at 158, 184 S.E.2d at 869); *see Parker*, 224 N.C. at 525, 31 S.E.2d at 531; *Addor*, 183 N.C. at 689, 110 S.E. at 651.

Furthermore, in striking an agreement with the hired killer to kill his former wife and paying the supposed hired killer in full, defendant engaged in more conduct than that minimally necessary for a solicitation; however, he did not commit an overt act amounting to attempt.[3]

We conclude that even though hiring and paying a hired killer exceeds the minimum conduct required to prove solicitation, such acts do not satisfy our requirement of overt acts necessary to prove attempt.[4] The Court of Appeals

---

[3] Here the "hitman" was an undercover police officer who had no intention of killing defendant's former wife, and as such, defendant was not charged with conspiracy. Under North Carolina law, a conspiracy exists when "*two or more* persons" agree to "do an unlawful thing or to do a lawful thing in an unlawful way by unlawful means." *State v. Horton,* 275 N.C. 651, 656, 170 S.E.2d 466, 469 (1969) (emphasis added) (quoting *State v. Gallimore*, 272 N.C. 528, 532, 158 S.E.2d 505, 508 (1968)), *cert. denied,* 398 U.S. 959, 90 S. Ct. 2175, 26 L. Ed. 2d 545 (1970); *State v. Goldberg*, 261 N.C. 181, 202, 134 S.E. 2d 334, 348 (emphasis added), *cert. denied,* 377 U.S. 978, 84 S. Ct. 1884, 12 L. Ed. 2d 747 (1964), *disapproved on other grounds by News & Observer Publ'g Co. v. State ex rel. Starling*, 312 N.C. 276, 283, 322 S.E.2d 133, 138 (1984). "No overt act is necessary to complete the crime of conspiracy." *Goldberg*, 261 N.C. at 202, 134 S.E. 2d at 348 (citing *State v. Davenport*, 227 N.C. 475, 494, 42 S.E.2d 686, 699 (1947)). "The crime is complete when the agreement is made." *Horton*, 275 N.C. at 656, 170 S.E.2d at 469 (quoting *Gallimore*, 272 N.C. at 532, 158 S.E.2d at 508). Here, had the hired killer not actually been an undercover officer, and had the hired killer actually agreed to kill defendant's former wife, this gap where new conduct did not give rise to new criminal liability would have been filled by the conspiracy doctrine.

[4] Because a solicitation is complete under North Carolina law even if it is "of no effect," *Hampton*, 210 N.C. at 284, 186 S.E. at 252, defendant had committed the solicitation even

concluded that defendant had committed an overt act because "[a]ll that remained was for the hitman (had he not been an undercover agent) to kill [defendant's] ex-wife." *Melton*, 2017 WL 2644445, at *2. But, even in giving the State the benefit of every reasonable inference from these facts, we conclude that defendant's actions, reprehensible as they were, failed to qualify as attempt under our common law. Furthermore, although defendant and the supposed hired killer agreed to a "criminal design," neither defendant nor his apparent agent had begun to "execut[e]" it at the time defendant exited the "hitman's" car. *Parker*, 224 N.C. at 526, 31 S.E.2d at 532; *Addor*, 183 N.C. at 688, 110 S.E. at 650. We must conclude that, without more, none of defendant's conduct would have resulted in the commission of the offense in the "ordinary and likely course of things." *Miller*, 344 N.C. at 668, 477 S.E.2d at 921 (quoting *Price*, 280 N.C. at 158, 184 S.E.2d at 869); *see Parker*, 224 N.C. at 525, 31 S.E.2d at 531; *Addor*, 183 N.C. at 689, 110 S.E. at 651. Unless and until our legislature decides to define attempt differently by statute or to alter its current policy and equate solicitation with attempt, this evidence shows only solicitation.

Our conclusion here is strengthened by comparing these facts with those in other cases in which this Court has analyzed attempt. In *Addor* we concluded that there was "no unlawful attempt to commit the crime" of "unlawful manufacture of liquor." *Addor*, 183 N.C. at 691, 110 S.E. at 652. Specifically, we concluded that the

---

before he paid the hired killer in full and, earlier still, before he and the hired killer even reached an agreement.

defendants had not committed an overt act, because "at the time [they] had never made any liquor, did not have a still, and had not been able to procure one, thus showing that the perpetration of the alleged crime was at the time obviously impossible." *Id.* at 690, 110 S.E. at 652. Accordingly we reasoned that the defendants merely "devis[ed] or arrang[ed] the means or measures necessary [to] the commission of the offense." *Id.* at 690, 110 S.E. at 652 (quoting *Murray*, 14 Cal. at 159, 1859 WL 1186, at *1). This conclusion was supported by the fact that, at the time of arrest, the defendants merely

> "had some meal and bran; that, at the time of being arrested, defendants stated to the sheriff that they intended to make some liquor out of said meal and bran; that defendants did not have a still, but stated that some one had promised to let them have a still later; that defendants intended to make some liquor, if they could get a still, but they never got a still and never made any liquor."
> The above constitutes all the defendants did.

*Id.* at 688, 110 S.E. at 650 (quoting the jury's special verdict).

By contrast, we concluded in *Parker* that the defendants "with the intent to feloniously receive stolen property, knowing it to have been stolen, made an attempt" to do so when they "in the nighttime went to the place of concealment and were in the act of having [the property] rolled out to their truck." *Parker*, 224 N.C. at 526, 31 S.E.2d at 532. We concluded that "[t]his was more than an act of mere preparation. It was an act that amounted to the commencement of the consummation, an act apparently adapted to produce the result intended." *Id.* at 526, 31 S.E.2d at 532.

In *Price* we also concluded that the evidence was sufficient to find that the defendant "attempt[ed] to rob another of personal property . . . with the use of a dangerous weapon, whereby the life of a person [was] endangered or threatened." 280 N.C. at 157, 184 S.E.2d at 869. There the defendant "entered the store with the intent to rob [the victim], struck him in the head with a blackjack, a dangerous weapon, for the purpose of accomplishing the intended robbery and thereby endangered his life." *Id.* at 158, 184 S.E.2d at 869. These overt acts amounted to an attempt. *Id.* at 158, 184 S.E.2d at 869.

In *Miller* we concluded that "there is sufficient evidence of intent to commit armed robbery and overt acts toward its commission, and so, by extension, to support the convictions for attempted armed robbery and first-degree murder under the felony murder rule." *Miller*, 344 N.C. at 669, 477 S.E.2d at 922. We concluded that sufficient evidence showed attempt based on the following facts:

> Here, defendant clearly intended to rob [the victim] and took substantial overt actions toward that end. His intent is evidenced by, *inter alia*, his statement to his cousin and his own admission to the authorities. In furtherance of the intended robbery, defendant took out his nine-millimeter handgun, sneaked up on [the victim], tried to fire, took the gun back down, removed the safety, and then fired two lethal shots into the head of the victim. It was only *after* seeing what he had done that defendant became scared and ran away. The sneak approach to the victim with the pistol drawn and the first attempt to shoot were each more than enough to constitute an overt act toward armed robbery, not to mention the two fatal shots fired thereafter.

*Id.* at 668-69, 477 S.E.2d at 922 (citing *State v. Powell*, 277 N.C. 672, 677-79, 178 S.E.2d 417, 420-21 (1971)).

We conclude the facts here are more comparable to *Addor* than to *Parker*, *Price*, or *Miller*. As in *Addor*, "the perpetration of the alleged crime was at the time obviously impossible," because a necessary component of the underlying crime was not within defendant's, or his agent's, reach. *Addor*, 183 N.C. at 690, 110 S.E. at 652. At the time of their arrest, the defendants in *Addor* "did not have a still," *id.* at 690, 110 S.E. at 652; similarly, at the time of defendant's arrest here, no evidence showed that defendant had a weapon or an action plan other than for someone else to carry out the underlying crime. Moreover, at that time, the intended victim's whereabouts were not known, and the agent, as an undercover officer, was never actually going to kill defendant's former wife.

As discussed above, the evidence here showed acts by defendant that were all part of the solicitation, not the execution, of the crime solicited. We see no evidence here to establish that defendant committed an overt act that, "in the ordinary and likely course of things," would have resulted in the killing. *Miller*, 344 N.C. at 668, 477 S.E.2d at 921 (quoting *Price*, 280 N.C. at 158, 184 S.E.2d at 869); *see Parker*, 224 N.C. at 525, 31 S.E.2d at 531; *Addor*, 183 N.C. at 689, 110 S.E. at 651. Therefore, defendant's motion to dismiss was improperly denied.

III. **Conclusion**

Accordingly, we reverse the Court of Appeals' decision upholding defendant's

conviction for attempted first-degree murder. Because of this holding, we need not address the double jeopardy issue. This case is remanded to the Court of Appeals for further remand to the trial court with instructions to vacate defendant's conviction for attempted first-degree murder and the judgment entered thereon, and for resentencing consistent with this opinion.

REVERSED IN PART; VACATED IN PART AND REMANDED.

Justice MORGAN dissenting.

I respectfully dissent from the majority's determination that defendant's motion to dismiss the charge of attempted first-degree murder was improperly denied by the trial court. In applying the well-established legal standards to assess the sufficiency of evidence offered by the prosecution in a criminal case in the face of a defendant's motion to dismiss, I strongly disagree with the ultimate conclusion of my learned colleagues in the majority that there is "*no* evidence here to establish that defendant committed an overt act that, 'in the ordinary and likely course of things,' would have resulted in the killing." (Emphasis added.) I would affirm the decision of the Court of Appeals in this matter and agree with its well-reasoned analysis that defendant's acts under review satisfied the elements of an attempt to commit first-degree murder.

It is well-established that

> [w]hen reviewing a defendant's motion to dismiss a charge on the basis of insufficiency of the evidence, this Court determines "whether the State presented 'substantial evidence' in support of each element of the charged offense. " ' "Substantial evidence" is relevant evidence that a reasonable person might accept as adequate, or would consider necessary to support a particular conclusion.' " In this determination, all evidence is considered " "in the light most favorable to the State, and the State receives the benefit of every reasonable inference supported by that evidence.' ". . . "[I]f there is substantial evidence—whether direct, circumstantial, or both—to support a finding that the offense charged has been committed and that the

> defendant committed it, the case is for the jury and the motion to dismiss should be denied."

*State v. Hunt*, 365 N.C. 432, 436, 722 S.E.2d 484, 488 (2012) (quoting *State v. Abshire*, 363 N.C. 322, 327-28, 677 S.E.2d 444, 449 (2009) (citations omitted), *superseded on other grounds by statute*, An Act to Protect North Carolina's Children / Sex Offender Law Changes, ch. 247, Sec. 8(a), 2005 N.C. Sess. Laws (Reg. Sess. 2006) 1065, 1070-71, *as recognized in State v. Barnett*, 368 N.C. 710, 714-15, 782 S.E.2d 885, 889 (2016)). "Any contradictions or conflicts in the evidence are resolved in favor of the State, and evidence unfavorable to the State is not considered." *State v. Miller*, 363 N.C. 96, 98, 678 S.E.2d 592, 594 (2009) (citations omitted). Both competent and incompetent evidence must be considered. *State v. Allen*, 279 N.C. 406, 407, 183 S.E.2d 680, 681 (1971). "[S]o long as the evidence supports a reasonable inference of the defendant's guilt, a motion to dismiss is properly denied even though the evidence also 'permits a reasonable inference of the defendant's innocence.' " *Miller*, 363 N.C. at 99, 678 S.E.2d at 594 (quoting *State v. Butler*, 356 N.C. 141, 145, 567 S.E.2d 137, 140 (2002)).

"The elements of an attempt to commit any crime are: (1) the intent to commit the substantive offense, and (2) an overt act done for that purpose which goes beyond mere preparation, but (3) falls short of the completed offense." *State v. Miller*, 344 N.C. 658, 667, 477 S.E.2d 915, 921 (1996) (citations omitted). With regard to the second element, this Court has opined that:

> it is essential that the defendant, with the intent of committing the particular crime, should have done some overt act adapted to, approximating, and which in the ordinary and likely course of things would result in the commission thereof. Therefore, the act must reach far enough towards the accomplishment of the desired result to amount to the commencement of the consummation. It must not be merely preparatory. In other words, while it need not be the last proximate act to the consummation of the offense attempted to be perpetrated, it must approach sufficiently near to it to stand either as the first or some *subsequent step in a direct movement towards the commission of the offense after the preparations are made*.

*Id.* at 668, 477 S.E.2d at 921 (quoting *State v. Price*, 280 N.C. 154, 158, 184 S.E.2d 866, 869 (1971) (emphasis added)).

In applying these unassailable and fundamental legal principles to the unique facts which are presented in the instant case, in my view it is clear that the State has presented *some* evidence to establish that defendant committed an overt act that, in the ordinary and likely course of things, would have resulted in the killing of defendant's ex-wife, but for the intended "hitman" actually being an undercover law enforcement officer. As the majority notes, the evidence produced at trial by the State showed that defendant originally disclosed to his acquaintance Lawrence Sorkin that defendant was feeling pressured by defendant's ongoing child custody dispute with his ex-wife, that defendant was willing to pay Sorkin $200 to discuss something that would be "beneficial" to defendant, that defendant was tired of going to court, and that defendant reminded Sorkin of an earlier conversation between the two of them in which Sorkin had stated that Sorkin's father had connections to men who could

"break a few legs."  This discussion led Sorkin to fear that defendant was actively contemplating the prospect of bringing harm upon defendant's ex-wife.  After this conversation, defendant was amenable to participating in a meeting that transpired less than a month later in which Sorkin arranged for defendant to talk with someone unknown to defendant—the undercover officer posing as a "hitman"—with said meeting occurring in a retail store parking lot, initiated by defendant's entry into an unknown person's car at Sorkin's direction after which defendant was immediately queried by the "hitman" about the presence of any recording device on defendant's person.  Upon the request of the "hitman," defendant readily displayed the $2500 in cash which defendant was instructed to bring to the meeting.  The unknown "hitman" asked for detailed information about defendant's ex-wife, which defendant readily provided:  her name, address, cellular telephone number, and car description.  Defendant also supplied photographs of his ex-wife to the "hitman."  In response to this individual's questions about the manner in which he could get the ex-wife alone, defendant gave the "hitman" the name of their daughter's elementary school, the times at which the ex-wife would drop off the child at said school, and he informed the "hitman" that the ex-wife was always alone in her car after the daughter was taken to school.  After obtaining this information, the undercover officer posing as the "hitman" gave defendant specific instructions concerning the payment of the remaining balance of $7500 for the "hit" on defendant's ex-wife, the six-day duration of time in which the "hitman" would purchase a telephone and during which

defendant should obtain a certain kind of telephone at a specified time and send a text message to the "hitman" from defendant's designated telephone, defendant's receipt of information on where to send the outstanding $7500 when "it's done," and defendant's need to destroy defendant's designated telephone "when we're done." The "hitman" went on to ask defendant where defendant wanted his ex-wife's dead body, and after a further exchange, defendant stated, "I need to be the sole parent making every decision with my daughter all the time, and no chance of any more court cases. Totally no chance." When the "hitman" assured defendant that the "hitman" could provide defendant with sole custody of his daughter if this was defendant's desire, defendant reiterated that he wanted sole custody. As to where defendant wanted his ex-wife's dead body and the manner in which defendant wanted the "hitman" to "do it," defendant said, "[A]s long as there's no chance that I will answer questions or be involved, I want—I want to make sure that my daughter is with me all the time, only me, no chance of any further court cases or anything." Defendant then offered examples of school days and school time periods to the "hitman" at which times the "hit" could be accomplished in the absence of the daughter. On the subject posed by the "hitman" regarding how defendant "wanted it done," defendant replied, "I don't care about any details." Towards the end of the meeting, defendant voluntarily tendered the total sum of $10,000 for the killing of defendant's ex-wife to the "hitman," after which the "hitman" informed defendant that the two of them would have no further communication, and defendant would know when the ex-wife was

dead. As the discussion ended, when the undercover law enforcement officer representing himself as the "hitman" told defendant that defendant's ex-wife could "disappear," defendant answered that he wanted her to "disappear." At that point, all but the actual "hit" was complete. From defendant's perspective, he had done all that he could do to achieve the murder of his ex-wife.

In light of the totality of these evidentiary facts adduced at trial, I would find that the State's presentation was sufficient to withstand defendant's motion to dismiss the attempted first-degree murder charge and that the trial court correctly denied the motion. The State presented substantial evidence in support of each element of the charged offense of attempted first-degree murder. With the State's entitlement to the benefit of every reasonable inference supported by the evidence regarding whether or not defendant committed the criminal offense of attempted first-degree murder, it was up to the jury at trial to determine if defendant's state of mind, acts, statements, representations, suggestions, and offers—or the lack thereof—during his interactions with his acquaintance Sorkin and the undercover officer posing as a "hitman" all combined to render defendant guilty of the charged offense. In my view, the State in the case sub judice clearly established, in accordance with this Court's decision in *Miller*, that defendant had the intent to commit the substantive offense of first-degree murder of his ex-wife through his detailed arrangements with, and voluntary full payment of funds to, the supposed "hitman"; that defendant performed an overt act toward commission of the killing beyond mere

preparation, by virtue of these detailed arrangements regarding the myriad of informational items supplied to the "hitman" about the ex-wife along with the full payment to the "hitman" of the price for the deadly deed; and that defendant had no part in the ultimate outcome here, namely the incompletion of the substantive offense of first-degree murder because of the actual non-existence of the "hitman" with whom defendant assumed he had hired to perform the killing.

The majority here adopts the position that the evidence at trial did not satisfy the second prong of the three-part *Miller* test regarding the elements of an attempt to commit a crime because no overt act by defendant rose to the level of an attempt beyond mere solicitation of the undercover officer posing as a "hitman" to perpetrate the killing. According to the majority's scale of measure, the evidentiary facts that I delineated earlier and which the Court of Appeals likewise identified in its opinion do not "amount to proof of overt acts amounting to attempt under our law" or constitute any overt act "apparently adapted to produce the result intended" because "the act of planning the killing and making an initial payment to the hired killer would not, without additional conduct, inexorably result in the commission of the offense in the 'ordinary and likely course of things.' " The majority further deems defendant's conduct to constitute only solicitation and not an overt act amounting to attempt because "although defendant and the supposed hired killer agreed to a 'criminal design,' neither defendant nor his apparent agent had begun to 'execut[e]' it at the time defendant exited the 'hitman's' car." I believe that the majority has

unconsciously and unfortunately elevated the commission of an overt act as an element of attempt with these analytical conclusions, because defendant's willingness to allow the "hitman" to choose among the plethora of times, places, and circumstances that defendant himself has identified as potential aspects of the killing and the futuristic aspects of specific directives identified by the "hitman" regarding timelines of the perpetration of the plan, should not be deemed as fundamentally fatal to the prosecution's ability to allow the jury to determine whether or not defendant committed an overt act as an element of the offense of attempted first-degree murder. Under the circumstances presented in this case, particularly defendant's voluntary payment in full of the "hitman's" required sum, defendant had completed his role in his plan to murder his ex-wife.

For the reasons stated, I would affirm the opinion of the Court of Appeals in this case.

Chief Justice MARTIN and Justice NEWBY join in this dissenting opinion.